UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Brett Soloway,
*Plaintiff-Appellant,*

V.

ALM Global, LLC and Hugo Guzman,
*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District
of Illinois, Eastern Division
Case No. 1:24-cv-02925
The Honorable Georgia N. Alexakis, District Judge

## OPENING BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFF-APPELLANT BRETT SOLOWAY

Nicole E. Wrigley
    *Counsel of Record*
Patrick J. Beisell
nwrigley@beneschlaw.com
pbeisell@beneschlaw.com
Benesch, Friedlander, Coplan &
Aronoff LLP
71 South Wacker Drive, Ste 1600
Chicago, Illinois 60606
Telephone: 312.212.4949

*Attorneys for Plaintiff- Appellant
Brett Soloway*

March 3, 2025

**ORAL ARGUMENT REQUESTED**

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __24-3104__

Short Caption: _____Soloway v. ALM Global, LLC and Hugo Guzman_

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED

The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P.
26.1 by completing the item #3):

_____Brett Soloway_____
The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_____BENESCH FRIEDLANDER COPLAN & ARONOFF LLP_____
If the party, amicus or intervenor is a corporation:
Identify all its parent corporations, if any; and

_____N/A_____
List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

_____N/A_____
Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

_____N/A_____
Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

_____N/A_____

Attorney's Signature: _____ s/ Patrick J. Beisell _____ Date: _ 3/3/2025 _____

Attorney's Printed Name: _ Patrick J. Beisell _____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule
3(d). Yes: __ No:__ X __.

Address: _71 South Wacker Drive, Suite 1600_
_Chicago, IL 60606_____
Phone Number: _312-624-6338_____
Fax Number: _312-767-9192_____
E-Mail Address: _pbeisell@beneschlaw.com_____

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __24-3104__

Short Caption: _____Soloway v. ALM Global, LLC and Hugo Guzman__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED

The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P.
26.1 by completing the item #3):

_____Brett Soloway_____
The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_____BENESCH FRIEDLANDER COPLAN & ARONOFF LLP_____
If the party, amicus or intervenor is a corporation:
Identify all its parent corporations, if any; and

_____N/A_____
List any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

_____N/A_____
Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

_____N/A_____
Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

_____N/A_____

Attorney's Signature: _____s/ Nicole E. Wrigley_____    Date: _3/3/2025_____

Attorney's Printed Name: __Nicole E. Wrigley____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule
3(d). Yes: _X_ No: ___

Address:              71 South Wacker Drive, Suite 1600
                      Chicago, IL  60606
Phone Number:     312-624-6347
Fax Number:       312-767-9192
E-Mail Address:   nwrigley@beneschlaw.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................3

STATEMENT OF THE CASE ..................................................4

    A.   Factual Background..................................................4

        1.   The New York Attorney General Litigation & Cushman Subpoenas ..................................4

        2.   Defendants' April Article Regarding Mr. Soloway..................................................6

        3.   Mr. Soloway's Attempts to Have the April Article Corrected or Retracted ...................10

        4.   Defendants' September Article Regarding Mr. Soloway.............................................11

        5.   Defendants' Publications Harmed Mr. Soloway.............................................13

    B.   Procedural Background .......................................17

SUMMARY OF THE ARGUMENT .......................................19

STANDARD OF REVIEW..................................................21

ARGUMENT..................................................22

I.   DEFENDANTS' PUBLICATIONS ABOUT MR. SOLOWAY CONSTITUTE DEFAMATION *PER SE*....................24

    A.   Defendants' Publications Were False .................25

    B.   Defendants' Publications Were Made to a Third Party ..................................................26

    C.   Defendants' Publications Were Unprivileged......................27

        1.   Defendants' Publications Were Not Conditionally Privileged.............................27

    D.   Defendants' Publications Caused Damages.........................32

II.   The Publications Are Not Protected By The Innocent Construction Rule..................................................33

A.     Defendants' Publications Cannot Be Innocently Construed Because Only the Headline and Byline Were Publicly Available.........................................36

B.     Even Considering Defendants' Publications as a Whole, They Cannot Be Innocently Construed Because They Defame By Implication ..................................41

III.   DEFENDANTS' PUBLICATIONS ABOUT MR. SOLOWAY ALSO CONSTITUTE DEFAMATION *PER QUOD*..................................................................................51

A.     Mr. Soloway Pled Sufficient Extrinsic Facts to State a Claim for Defamation *Per Quod* .............................52

B.     Mr. Soloway Pled Sufficient Allegations of Special Damages to State a Claim for Defamation *Per Quod*..................................................................................54

IV.   DEFENDANTS' PUBLICATIONS ARE NOT PRIVILEGED OR PROTECTED....................................................59

A.     The Publications Are Not Protected Opinions......................60

B.     The Substantial Truth Defense Does Not Protect Defendants' Publications ........................................................63

CONCLUSION ........................................................................................65

# TABLE OF AUTHORITIES

**Page**

CASES

*Action Repair, Inc. v. American Broadcasting Companies, Inc.*,
776 F.2d 143 (7th Cir. 1985) .........................................................35, 48

*Andrews v. At World Properties, LLC*,
2023 IL App (1st) 220950 (2023)...........................................................63

*Becker v. Zellner*,
292 Ill. App. 3d 116 (1997) .............................................................56, 58

*Bryson v. News America Publications, Inc.*,
174 Ill. 2d 77 (1996).................................................................................51

*Chaidez v. Ford Motor Co.*,
937 F.3d 998 (7th Cir. 2019) ..................................................................21

*Chapski v. Copley Press*,
92 Ill. 2d 344 (1982)..................................................................41, 48, 49

*Church of Scientology of Cal. v. Flynn*,
744 F.2d 694 (9th Cir. 1984) ..................................................................44

*Cody v. Harris*,
409 F.3d 853 (7th Cir. 2005) ..................................................................33

*Dent v. Constellation NewEnergy, Inc.*,
2022 IL 126795 (2022)............................................................................28

*Doctor's Data, Inc. v. Barrett*,
170 F. Supp. 3d 1087 (N.D. Ill. 2016) ...................................................51

*Dubinsky v. United Airlines Master Exec. Couns.*,
303 Ill. App. 3d 317 (1999) ....................................................................60

*Giant Screen Sports v. Canadian Imperial Bank of Commerce,*
 553 F.3d 527 (7th Cir. 2009) ......................................... 35, 44

*Glassman v. Metro. Life Ins. Co.,*
 616 F. Supp. 145 (N.D. Ill. 1985) ................................... 47

*Green v. Rogers,*
 234 Ill. 2d 478 (2009) .................................................. 34, 35

*Halpern v. News-Sun Broadcasting Co.,*
 53 Ill. App. 3d 644 (1977) ............................................ 56

*Harrison v. Chi. Sun–Times, Inc.,*
 793 N.E.2d 760 (2003) ................................................. 35

*Haynes v. Alfred A. Knopf, Inc.,*
 8 F.3d 1222 (7th Cir.1993) ........................................... 61

*Hill v. Schmidt,*
 2012 IL App (5th) 110324 (2012) ................................... 51

*Huon v. Denton,*
 841 F.3d 733 (7th Cir. 2016) ........................................ 40

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,*
 367 Ill. App. 3d 48 (2006) ............................................ 57

*Johnston v. Borders,*
 36 F.4th 1254 (11th Cir. 2022) ...................................... 45

*Joseph v. Collis,*
 272 Ill. App. 3d 200 (1995) .......................................... 27

*Kolegas v. Heftel Broadcasting Corp.,*
 154 Ill. 2d 1 (1992) .................................................... 48, 55

*Kopolovic v. Shah,*
 2012 IL App (2d) 110383 (2012) .................................... 64

*Kuwik v. Starmark Star Mktg. & Admin., Inc.*,
   156 Ill. 2d 16 (1993) ................................................................. 47

*L. Offs. of David Freydin, P.C. v. Chamara*,
   24 F.4th 1122 (7th Cir. 2022) ................................................. 32

*Las Vegas Sun, Inc. v. Franklin*,
   74 Nev. 282 (1958) .................................................................. 37

*Levinson v. Time, Inc.*,
   89 Ill. App. 3d 338 (1st Dist. 1980) .................................. 47, 48

*MFB Fertility Inc. v. Action Care Mobile Veterinary Clinic LLC*,
   730 F. Supp. 3d 740 (N.D. Ill. 2024). .................................... 50

*Mittelman v. Witous*,
   135 Ill. 2d 220 (1989) .............................................................. 47

*Moriarty v. Greene*,
   315 Ill. App. 3d 225 (2000) ..................................................... 61

*Morton Grove Pharms., Inc. v. Nat'l Pediculosis Ass'n, Inc.*,
   494 F. Supp. 2d 934 (N.D. Ill. 2007) ................................. 54, 58

Muzikowski v. Paramount Pictures Corp.,
   322 F.3d 918 (7th Cir. 2003) ................................................... 34

*Nunes v. Lizza*,
   12 F.4th 890 (8th Cir. 2021) ................................................... 44

*Owen v. Carr*,
   113 Ill. 2d 273 (1986) .............................................................. 60

*Price v. Stossel*,
   620 F.3d 992 (9th Cir. 2010) ................................................... 44

*project44, Inc. v. FourKites, Inc.*,
   2024 IL 129227 (2024) ............................................................. 26

*Quinn v. Jewel Food Stores,*
276 Ill. App. 3d 861 (1995) ....................................................... 53

*Solaia Technology, LLC v. Specialty Publishing Co.,*
221 Ill. 2d 558 (2006) ................ 19, 24, 28, 29, 30, 32, 33, 42, 46, 60, 62

*Solano v. Playgirl, Inc.,*
292 F.3d 1078 (9th Cir. 2002) ................................................. 38, 39, 40

*Tamayo v. Blagojevich,*
526 F.3d 1074 (7th Cir. 2008) .............................................. 21, 46, 54, 59

*TMJ Implants, Inc. v. Aetna, Inc.,*
498 F.3d 1175 (10th Cir. 2007) .......................................................... 45

*Tuite v. Corbitt,*
224 Ill. 2d 490 (2006) ...................................................................... 35, 49

*Tunca v. Painter,*
2012 IL App (1st) 093384 (2012) ...................................... 52, 54, 56, 58

*White v. Fraternal Ord. of Police,*
909 F.2d 512 (D.C. Cir. 1990) ............................................................ 45

*Windsor Lake, Inc. v. WROK,*
94 Ill. App. 2d 403 (1968) ................................................................... 57

*Yount v. Handshoe,*
171 So. 3d 381 (La. App. 5 Cir. 5/28/15) .......................................... 31

*Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
742 F. Supp. 1359 (N.D. Ill. 1990) ..................................................... 41

*Zych v. Tucker,*
363 Ill. App. 3d 831 (2006) ................................................................ 27

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (12th ed. 2024).................................................25

MERRIAM-WEBSTER DICTIONARY.............................................................25

Restatement (Second) of Torts § 563, Comment *d* (1977) ......................37

Restatement (Second) of Torts § 611, Comment *f* (1977) .......................31

W. Page Keeton et al.,
    Prosser and Keeton on the Law of Torts § 111 (5th ed.1984) ............53

# JURISDICTIONAL STATEMENT

On April 11, 2024, Brett Soloway filed a complaint in the United States District Court for the Northern District of Illinois against Defendants ALM Global, LLC and Hugo Guzman ("Defendants") alleging that Defendants published two articles falsely claiming that Mr. Soloway fired by his former employer—Cushman & Wakefield PLC ("Cushman")—as a result of a contempt order entered against Cushman in a civil case involving President Donald Trump. App. 1-46.[1]

The District Court had subject matter jurisdiction over Mr. Soloway's complaint pursuant to 28 U.S.C. § 1332 because there was (and still is) complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. App. 5-8. Mr. Soloway is a United States citizen and resident of Illinois. App. 5. Defendant ALM Global, LLC is a Delaware corporation with its principal place of business in New York. App. 6. Defendant Hugo Guzman is a citizen of the State of California.

---

[1] Citations to "RSA" are to the Required Short Appendix bound with this brief. Citations to "App." are to the separately bound Appendix.

The District Court had personal jurisdiction. Defendants'
defamatory articles were and are accessible to, and have been viewed
by, individuals in Illinois, and targeted and injured an Illinois resident.
App. 8-9. The District Court's personal jurisdiction is not contested.

Finally, the complaint was filed in the proper venue pursuant to
28 U.S.C. § 1391(b)(2) because the defamatory article and tweet were
published in Illinois by Defendants. App. 9.

On October 18, 2024, the District Court granted Defendants'
Motion to Dismiss, dismissed Mr. Soloway's complaint without
prejudice, and permitted Mr. Soloway to amend his complaint before
November 7, 2024. RSA 1-20. Mr. Soloway did not file an amended
complaint. On November 8, 2024, the District Court terminated the
case, converted the dismissal to one with prejudice, and issued the Rule
58 final judgment. RSA 21-22. Pursuant to Fed. R. App. P. 4(a)(1)(A),
Mr. Soloway had until December 8, 2024 to file his Notice of Appeal. On
November 18, 2024, Mr. Soloway filed his Notice of Appeal. App. 121.

This Court has jurisdiction to hear this appeal under 28 U.S.C. §
1291 because Mr. Soloway appeals from a final order disposing of his
claims and terminating his civil case.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

As a matter of first impression: does the innocent construction rule apply to a defamatory article when the headline and byline, defamatory themselves, are publicly accessible, but the body of the article is locked behind a paywall and therefore inaccessible?

Did the District Court improperly dismiss Plaintiff's claim of defamation *per se* due to an erroneous application of the innocent construction rule?

Did the District Court improperly dismiss Plaintiff's claim of defamation *per quod*?

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. The New York Attorney General Litigation & Cushman Subpoenas

In September 2021 and February 2022, Cushman—a global commercial real estate services company—was subpoenaed by the New York Attorney General to provide documents relating to appraisals of Trump Organization properties in the matter *New York v. The Trump Organization, Inc., et al.*, No. 451685/2020 (NY Sup. Ct. 8/24/2020). App. 9 at ¶ 30. The civil case against President Trump—like all President Trump-related litigation—was highly publicized. *Id*. The New York Attorney General accused the Trump Organization of financial fraud by presenting vastly disparate property values to lenders and tax officials. *Id*. The New York Attorney General did not accuse Cushman of wrongdoing. *Id*.

Cushman retained two outside counsel law firms to provide legal assistance in responding to the subpoenas. App. 10 at ¶ 32. Cushman responded in part to the subpoenas and also moved to quash in part on confidentiality grounds. App. 9 at ¶ 31. In July 2022, Judge Engoron held Cushman in contempt of court for failing to timely respond. *Id*. In

August 2022, after an appeal by Cushman, the Court ordered that Cushman was "purged" of its "contempt of court" and further held that "no fines were paid or need to be paid." App. 9-10 at ¶ 31.

After Cushman's contempt order was purged in August 2022, Cushman's involvement in the *Trump Organization* litigation was no longer of interest to the media. App. 10 at ¶ 33. When the *Trump Organization* matter went to trial, and later when it was appealed, the media coverage was extensive. *Id*. at ¶ 34. Cushman was not involved in the trial or the appeal and was absent from all media coverage in conjunction with those proceedings. *Id*. Mr. Soloway was never the subject, either explicitly or implicitly, of any media coverage of the proceedings. App. 11 at ¶ 37.

In March 2023, seven months after the Cushman contempt order was purged, Mr. Soloway voluntarily resigned from Cushman on amicable terms. App. 11 at ¶ 35. Mr. Soloway wanted to take time off of work to determine the next stage of his career. *Id*. Under SEC regulations, Cushman was not required to publicly announce Mr. Soloway's departure, nor did Mr. Soloway want a public announcement.

*Id.* Mr. Soloway's departure was thus not made public by Cushman, or otherwise at the time. *Id.*

Mr. Soloway is a private figure. App. 11 at ¶ 37. He does not have a social media presence. *Id.* Mr. Soloway has never been involved in any controversy involving a matter of general public interest or concern—this includes the *Trump Organization* litigation. *Id.* Mr. Soloway did not file an appearance, nor did he appear in any filings in the *Trump Organization* matter. *Id.* Prior to this case, Mr. Soloway has never been the subject of any media coverage, professional or otherwise. *Id.*

### 2. Defendants' April Article Regarding Mr. Soloway

On April 14, 2023, eight months after Cushman was temporarily found in contempt and seven months after the contempt order was rescinded, Defendants published an article titled, "*Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe*" (the "April Article"). App. 11 at ¶ 38. The Article byline was "[t]he real estate service giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. It didn't explain the departure of Brett Soloway, who has been removed from the company's website." App. 12 at ¶ 40. The April Article (including the byline, and thus the headline)

specifically references Mr. Soloway by name and is of and concerning him. *Id*.; App. 38.

The first paragraph reads, "[t]he real estate services giant Cushman & Wakefield replaced general counsel Brett Soloway, a move that comes eight months after a judge found the company in contempt of court for not complying with subpoenas in New York Attorney General Letitia James' Donald Trump investigation." App. 38.

The second paragraph of the April Article reads, "Chicago-based Cushman on Thursday announced that former Archer Daniels Midland legal executive Noelle Perkins will join the company as general counsel on July 1. The news release made no reference to Soloway, who had been general counsel for nine years. His bio was removed from the company's website." App. 38.

The third paragraph reads, "Cushman did not respond to requests for comment, and Soloway could not be located for comment. Soloway, who was last identified as General Counsel in Cushman's US Securities and Exchange Commission filings in March, was a senior Home Depot attorney before joining the company in 2014." App. 38.

The remaining relevant portion of the April Article consists of four sentences about the Cushman contempt subpoena. App. 39. Mr. Soloway was not mentioned in this portion of the April Article. *Id*.

Despite the assertions in the April Article, Cushman did not make a unilateral decision to replace Mr. Soloway as General Counsel in connection with the *Trump Organization* litigation. App. 12 at ¶ 41. Mr. Soloway was not fired. *Id*. He was not asked to leave. *Id*. Instead, Mr. Soloway voluntarily left his position at Cushman on friendly terms with the company. App. 13 at ¶ 41. Mr. Soloway's departure from Cushman had nothing to do with the *Trump Organization* matter or any "Trump Probe." *Id*. at ¶ 42.

Defendants did not cite any sources in their Article that establish a connection between the "Trump Probe," the *Trump Organization* contempt order, and Mr. Soloway's departure from Cushman. App. 13 at ¶ 45; App. 38-39. The Defendants did not contact Mr. Soloway or Cushman before they published the April Article. App. 13 at ¶ 45.

Defendants published the April Article in Corporate Counsel, a publication and brand of ALM Global, LLC ("ALM"). App. 13 at ¶ 46. They also published the Article in the New York Law Journal, another

publication and brand of ALM. *Id*. Both of these publications are available on Law.com, which is owned by ALM. *Id*. Law.com is a subscription-based service and has over 1.5 million visitors per month. App. 14 at ¶¶ 47-48. If non-subscribers saw the sensational April headline and byline about Mr. Soloway and wanted to read the article, they would be prompted to subscribe to Law.com. *Id*. at ¶ 48. The headline and byline can be accessed by anyone using an online search. *Id*. at ¶ 47.

On April 14, 2023, New York Law Journal posted the headline "*Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe*" on Twitter (now known as X). App. 14 at ¶ 49; App. 41. The tweet linked back to the April Article. *Id*.

On multiple occasions following publication of the article, Mike Boonshoft, Cushman's head of public relations matters in the U.S., reached out to Defendant Guzman by email and voicemail to inform him of the factual inaccuracy of the article as it related to Mr. Soloway's departure. App. 22 at ¶ 77. Defendants did nothing. *Id*.  The Article remained available to subscribers, while the headline and byline remained available to all. App. 14 at ¶ 47; App. 23 at ¶ 78.

### 3. Mr. Soloway's Attempts to Have the April Article Corrected or Retracted

On August 8, 2023, Mr. Soloway, through counsel, sent a letter to ALM Chief Content Officer (Molly Miller) and Law.com's Editor in Chief (Zack Needles) demanding that Defendants correct the record by promptly retracting the article, issuing a correction, and desisting from further false reporting about Mr. Soloway and his departure from Cushman. App. 23 at ¶ 79. The letter also stated that the false and defamatory headline should not be allowed to remain online. *Id.*

On August 24, 2023, Law.com Editor Greg Andrews emailed Cushman: "We at Corporate Counsel/Law.com are thinking of updating our story from earlier this year on Brett Soloway's departure. For that update, would you address what the reasons were for Soloway's departure and what effect, if any, the Trump case contempt order had on it?" App. 23 at ¶ 80.

On August 25, 2023, Cushman's Chief Marketing & Communications Officer Brad Krieger emailed Mr. Andrews: "As policy, we never comment on the reasons why executives leave our organization, but your story, suggesting a direct link between his

departure and the contempt order, isn't accurate or factual." App. 23 at ¶ 81.

### 4. Defendants' September Article Regarding Mr. Soloway

On September 26, 2023, Defendants published a new version of the April Article (the "September Article"). App. 24 at ¶ 86; App. 43. The September Article (including the byline, and thus the headline) specifically references Mr. Soloway by name and is of and concerning him. *Id*. The headline of the September Article is, "*Cushman Replaces GC Who Headed Legal Department During Trump Probe*." App. 24 at ¶ 89; App. 43. The September Article's byline is, "[t]he real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. It didn't explain the departure of Brett Soloway." *Id*. at ¶ 90.

The September Article's first paragraph no longer states that Cushman has "replaced general counsel Brett Soloway," but instead reads, "[t]he news release made no reference to Brett Soloway, who had been general counsel for nine years, during which a judge found the company in contempt of court for not complying with subpoenas in New

York Attorney General Letitia James' Donald Trump investigation."
App. 27 at ¶ 93; App. 43.

The second and concluding paragraph of the September Article
reads, "Soloway, who was last identified as General Counsel in
Cushman's U.S. Securities and Exchange Commission filings in March,
was a senior Home Depot attorney before joining the company in 2014."
App. 27 at ¶ 94; App. 43.

The September Article does not point out that Mr. Soloway denied
the allegations. App. 28 at ¶ 97; App. 43. It does not inform readers of
the truth that was communicated directly to Defendants from both
Cushman and from Mr. Soloway himself: Mr. Soloway's departure from
Cushman had nothing to do with any legal proceeding involving
President Trump. *Id*. The September Article does not report that
Cushman unequivocally told Defendants that there was no link
between Mr. Soloway's departure and the *Trump Organization*
contempt order. *Id*. The September Article does not explain that there
was a seven-month gap between the New York court's reversed
contempt decision and Mr. Soloway's departure from Cushman. *Id*.  It
did not mention that Mr. Soloway left the company on good terms. App.

11 at ¶ 35; App. 43. No other media companies or news agencies tied Mr. Soloway's departure from Cushman to Trump. App. 21 at ¶ 72.

### 5. Defendants' Publications Harmed Mr. Soloway

Mr. Soloway's name and professional reputation are forever tarnished because of Defendants' publications. App. 30 at ¶ 103. Multiple third parties avoided Mr. Soloway and rejected his attempts to secure future employment. *Id*. He was removed from contemplation by recruiters and companies alike. *Id*. Mr. Soloway's candidacy as an in-house hire was negatively impacted by his name being associated with the President Trump litigation and allegations of poor job performance. *Id*. Mr. Soloway cannot address the Articles' false associations with prospective employers before being rejected. App. 30-31 at ¶ 104. This is because the initial step of screening a candidate often involves a simple "Google" search of their name *Id*. After publication, the headlines and bylines of the Articles became the primary result when Mr. Soloway's name was searched online. *Id*. His professional history, after a successful decade with Cushman, has been unfairly reduced to a false tie between his departure and the contempt order in the "Trump probe." App. 30-31 at ¶¶ 103-104. Due to the nature of online screening, Mr.

Soloway has no opportunity to inform potential employers that he successfully managed multi-million dollar legal, project, and operating budgets with full responsibility, or that he built a global compliance platform for a public company from the ground up. App. 30-31 at ¶ 104. Instead, they are only exposed to the misleading Articles. *Id.*

For example, Mr. Soloway tried to engage two well-established executive recruiting firms, both of whom were initially eager to speak with him and expressed strong interest in helping him find his next position. App. 31 at ¶ 105. But his attempts to engage with these recruiting firms failed because of the Articles. App. 31-32 at ¶¶ 105-108.

First, Mr. Soloway reached out to the recruiter who had previously placed him. App. 31 at ¶ 106. That recruiter was initially delighted to hear from Mr. Soloway and eager to help him transition to a new, lucrative position. *Id.* After the April Article was published, however, the recruiter did not contact Mr. Soloway again and ignored his attempts to reach out. *Id.*

Second, Mr. Soloway spoke with another recruiter after the April Article was published. App. 31 at ¶ 107. During their phone call, that recruiter specifically asked Mr. Soloway to explain the Defendants'

April Article. *Id*. Mr. Soloway explained that the premise of the Article was not founded in fact. *Id*. But his explanation did not matter. *Id*. Mr. Soloway never heard from that recruiter again because of the April Article. *Id*.

Mr. Soloway continued to pursue potential employment without the assistance of a recruiting firm. App. 32 at ¶ 110. Mr. Soloway met with an in-house hiring recruiter for a General Counsel position via Zoom. *Id*. The conversation was excellent: Mr. Soloway explained why his background and expertise would be a perfect fit for the company, and the hiring individual was clearly excited and impressed. *Id*. Mr. Soloway was told that he would be hearing from the recruiter within a week about the next steps in the process; she further commented that Mr. Soloway is an incredible candidate, likely in "high demand," and wanted to ensure his application was expedited. *Id*. Towards the end of the conversation, the individual asked about Mr. Soloway's online presence, to which Mr. Soloway responded that he does not maintain a LinkedIn. *Id*. Mr. Soloway then watched as the individual investigated his online presence and undoubtedly saw the Defendants' Articles. *Id*. There was a pause in the conversation and Mr. Soloway watched the

recruiter's face change composure. *Id.* Mr. Soloway heard back about that position three weeks later with an automated rejection message—a far cry from the excitement he experienced during the Zoom call before his name was Googled, and despite the fact he had been told he would be hearing from them within a week. *Id.*

Despite his excellent professional track record, Mr. Soloway has been removed from employment consideration and stricken from hiring lists. App. 33 at ¶ 111. For almost two years, Mr. Soloway has submitted his resume to many in-house legal executive positions. *Id.* For all but a few, he has been utterly ignored. *Id.*

Mr. Soloway's reputation and future employment have been and continue to be harmed by Defendants' Articles. App. 33 at ¶ 112. Mr. Soloway cannot find suitable employment. *Id.* The Articles have ruined his professional reputation as an excellent general counsel. *Id.* Mr. Soloway's departure from Cushman will now forever be falsely tied to a judicial "rebuke" from a "Trump Probe." *Id.*

In his position as General Counsel of Cushman, Mr. Soloway earned approximately $2 million per year. App. 33-34 at ¶ 114. Because of the Articles, Mr. Soloway has lost out on employment positions where

he would have earned a comparable or more lucrative salary. *Id.* His earning potential has been brought to zero because of Defendants' Articles. *Id.*

## B. Procedural Background

On April 11, 2024, Mr. Soloway filed a Complaint in the United States District Court for the Northern District of Illinois against Defendants ALM Global, LLC and Hugo Guzman seeking damages relating to two defamatory articles published by Defendants. App. 1-46.

On July 1, 2024, Defendants filed a Motion to Dismiss the Complaint. App. 47-80. On July 26, 2024, Mr. Soloway filed his Opposition to Defendants' Motion to Dismiss. App. 81-101. On August 9, 2024, Defendants filed a Reply in support of their Motion to Dismiss. App. 102-117.

While the parties were scheduled to present oral argument on the Motion to Dismiss on October 28, 2024, the District Court entered its order without giving the parties an opportunity to argue the motion orally. App. 118. On October 18, 2024, the District Court entered an order granting Defendants' Motion to Dismiss the Complaint without prejudice. RSA 1-20.

The District Court permitted Mr. Soloway to amend his Complaint to plead defamation *per quod* but prohibited Mr. Soloway from continuing to pursue a claim of defamation *per se*. RSA 18-19. The District Court ordered Mr. Soloway to file his amended complaint on or before November 7, 2024. *Id*. Mr. Soloway did not file an amended complaint.

On November 8, 2024, the District Court entered a minute order converting the prior dismissal without prejudice to a dismissal with prejudice. RSA 21. That same day, the District Court entered its final judgment and terminated the case. RSA 22.

On November 18, 2024, Mr. Soloway filed his Notice of Appeal appealing "the Memorandum Opinion granting ALM Global, LLC and Hugo Guzman's Motion to Dismiss, entered in this action on the 18th day of October 2024 (Dkt. 40), and the final judgment accordingly entered in this action on the 8th day of November 2024 (Dkt. 42)." App. 121.

# SUMMARY OF THE ARGUMENT

The District Court erred in dismissing Mr. Soloway's claims of defamation *per se* and defamation *per quod*.

First, Defendants' publications about Mr. Soloway constitute defamation *per se*. Defendants' Articles (including the headlines and bylines) contain false statements and implications about Mr. Soloway. Defendants' Articles were unprivileged and are not protected by the fair reporting privilege. Defendants' Articles were published to a third party. And Defendants' Articles fall under two of Illinois' categories of defamation *per se* and therefore damages are presumed: Defendants' articles impute (1) Mr. Soloway's inability to perform or lack of integrity in performing employment duties and/or (2) that Mr. Soloway lacks ability in his profession or otherwise prejudice Mr. Soloway in his profession. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 580 (2006).

Second, Defendants' publications about Mr. Soloway are not protected by the innocent construction rule and the District Court erred in ruling that they were so protected. The District Court improperly applied case law and strained to see an inoffensive gloss on Defendants'

Articles. RSA 7-15. Moreover, the District Court erroneously ignored the reality that the only publicly accessible pieces of Defendants' Articles were the false and defamatory headlines and bylines. *Id.*

Third, Mr. Soloway sufficiently pled a defamation *per quod* claim and the District Court's requirement that he amend his complaint to add more allegations to support his defamation *per quod* claim was wrong. RSA 16-20.

Fourth, Defendants' Articles are defamatory—either as defamation *per se* or *per quod*—and there are no other defenses or protections that can shield Defendants from liability.

# STANDARD OF REVIEW

Appellate review of a district court's grant of a motion to dismiss is *de novo*. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) ("We review a district court's decision to dismiss a complaint *de novo*, accepting as true the complaint's well-pleaded allegations and drawing all reasonable inferences in the plaintiffs' favor."). Additionally, in reviewing a district court's grant of a motion to dismiss, this Court "construe[s] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

# ARGUMENT

Defendants' publications about Mr. Soloway are not simply defamatory—they are clickbait headlines intentionally written to draw internet traffic for the sole purpose of increasing their own publicity and corporate revenue. For the majority of people who encountered Defendants' publications, the headline *"Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe"* and accompanying byline are the only information they would see because the rest of the article is hidden behind a paywall. App. 14 at ¶ 48; App. 38. Defendants hoped to draw readers in by converting the nondescript departure of Mr. Soloway into a provocative banner about the firing of the highest-ranking legal official at one of the world's largest real estate companies because of a judicial reprimand. And not just any judicial reprimand. Injecting "Trump Probe" into the headline all but ensured that the headline would attract readers. This is not a case about the need for a robust free press, or the need for unfettered free speech, or the need to protect constitutional liberties. This is a case where the worst modern journalistic tendency—misleading, sensationalized headlines intended

solely to drive internet traffic to a website—has ruined one man's livelihood.

When called to account for their actions, Defendants attempted to hide behind Illinois' innocent construction rule. The District Court erroneously applied the rule and refused to acknowledge the reality that Defendants' headlines and bylines were all that were available for any readers who were not subscribers to Defendants' websites. Defendants' publications constitute defamation *per se* and the innocent construction rule cannot change that fact. Moreover, even if Defendants' publications did not support defamation *per se*, they did support a defamation *per quod* claim without the need for Mr. Soloway to amend his complaint—another reversable error by the District Court. Finally, despite Defendants' attempts to shoehorn their publications into certain privileges and defenses, there are no legal theories that protect Defendants. Defendants' publications are defamatory.

This brief focuses for clarity's sake on the April Article because (1) the offending tweet published the same headline as the April Article and linked back to the April Article and (2) the September Article makes the same defamatory statements and implications as the April Article and

was only substantively changed in two ways. *Cf.* App. 38-39 (the April Article) with App. 43 (the September Article). First, the September Article headline changed from "*Cushman Replaced GC in Wake of Company's Rebuke by Judge in Trump Probe*" with "*Cushman Replaces GC Who Headed Legal Department During Trump Probe.*" *Id.* Second, the September Article dropped the following clause regarding Mr. Soloway from the byline: "who has been removed from the company's website." *Id.*

I. **DEFENDANTS' PUBLICATIONS ABOUT MR. SOLOWAY CONSTITUTE DEFAMATION *PER SE***

To state a claim for defamation, a "plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Solaia*, 221 Ill. 2d at 579. "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Id.* Defendants' publications about Mr. Soloway were false, unprivileged, made to a third party, and constitute a category of

defamation that Illinois deems defamatory *per se* and in which damages are presumed.

## A. Defendants' Publications Were False

The April Article is false in two ways.

First, the headline of the April Article—"*Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe*"—explicitly correlates Mr. Soloway's departure with the judicial "rebuke" in the "Trump Probe." App. 38. By juxtaposing Mr. Soloway's departure with the "[r]ebuke by Judge [Engoron] in [the] Trump [p]robe," the April Article makes clear that Mr. Soloway's apparent departure was *because of* the fallout from the "Trump Probe." *Id.* Indeed, the phrase "*in the wake of*" means "as a result of" or "as a consequence of." *In the Wake of*, MERRIAM-WEBSTER DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/wake (last visited Feb. 26, 2025). The term "rebuke" means "[a] sharp reproach or reprimand; reprobation." *Rebuke*, BLACK'S LAW DICTIONARY (12th ed. 2024). Both phrases negatively correlate Mr. Soloway's departure with the events of the "Trump Probe." That is false. Mr. Soloway's departure from Cushman had

nothing to do with any decision by the "Judge in a New York case" involving President Trump, or any "Trump Probe." App. 13 at ¶ 42.

Second, the April Article headline clearly implies that Cushman fired Mr. Soloway and replaced him with Noelle Perkins because of the judicial rebuke in the *Trump Organization* matter. App. 38. This is further emphasized in the publicly accessible byline: "The real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. It didn't explain the departure of GC Brett Soloway, who has been removed from the company's website." *Id*. The implication that Cushman fired Mr. Soloway is false. Cushman did not make a unilateral decision to replace Mr. Soloway as General Counsel. App. 12-13 at ¶ 41. Mr. Soloway was not fired. *Id*. He was not asked to leave. *Id*. Instead, Mr. Soloway voluntarily left his position at Cushman, on friendly terms with the company. *Id*.

### B.    Defendants' Publications Were Made to a Third Party

"The word 'publication' is a term of art referring to the intentional or negligent communication of the allegedly defamatory statement to a third party, that is, a person other than the person who is allegedly defamed." *project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 21 (2024)

(internal citations omitted). Defendants do not contest that their publications were made to a third party. Nor could they. Defendants' publications were intentionally disseminated across multiple online platforms for public consumption. App. 13-14 at ¶¶ 46-47.

## C.    Defendants' Publications Were Unprivileged

The question of whether a privilege is absolute or conditional is a matter of law to be decided by the court. *Zych v. Tucker,* 363 Ill. App. 3d 831, 834 (2006). In Illinois, "[t]he issue of privilege is an affirmative defense," and therefore Defendants were required to raise any such privilege in their Motion to Dismiss. *Joseph v. Collis*, 272 Ill. App. 3d 200, 210 (1995). Defendants raised a single privilege argument in their Motion to Dismiss: the "fair report" privilege, which is a conditional or qualified form of privilege. App. 62-64. Defendants have therefore waived any other type of privilege. As demonstrated below, Defendants' publications are not protected by the fair report privilege.

### 1.    Defendants' Publications Were Not Conditionally Privileged

"Qualified privilege in Illinois defamation law is based on a policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct

information." *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 30 (2022). Defendants have raised only one type of conditional privilege: the "fair report" privilege. App. 62-64.

"[T]he fair report privilege has two requirements: (1) the report must be of an official proceeding; and (2) the report must be complete and accurate or a fair abridgement of the official proceeding." *Solaia*, 221 Ill. 2d at 588.

The District Court was not persuaded by Defendants' argument that the fair report privilege should apply. The District Court explained "Defendants' article was not limited to reporting an 'official proceeding': It also discussed plaintiff's departure from Cushman and Cushman's incoming general counsel." RSA 19 at Fn. 6 (citing *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1104 (N.D. Ill. 2016)). The District Court was correct. The fair report privilege does not apply.

First, Defendants' publications were not limited to reporting on *New York v. The Trump Organization, Inc., et al.*, Index No. 451685/2020. Indeed, the focus of the publications—as evidenced by the April Article heading and byline—was on Cushman replacing Mr. Soloway with a new general counsel. App. 38-39.

Second, even assuming that Defendants' publications were "of an official proceeding," they were not "complete and accurate." *Solaia*, 221 Ill. 2d at 588. It is indisputable that Defendants' four-sentence summary of the unnamed and uncited case (*i.e.*, *New York v. The Trump Organization, Inc., et al.*, Index No. 451685/2020) was incomplete. App. 39. The Defendants' publications fail to explain that Cushman responded in part to the subpoenas, that Cushman moved to quash in part on confidentiality grounds, and that in August 2022, after an appeal by Cushman, the Court ordered that Cushman was purged of its contempt of court and further held that "no fines were paid or need to be paid." App. 9-10 at ¶ 31; App. 39. Indeed, Defendants' conceded their reporting is not complete and accurate when they affirmatively described their reporting of the proceeding as "substantially correct" rather than "complete and accurate." App. 63. "Substantially correct" is the standard Illinois uses to assess whether or not the reporting was a fair abridgment. *Solaia*, 221 Ill. 2d at 590 ("A fair abridgment means that the report must convey to readers a substantially correct account.") (internal citations and quotations omitted).

However, Defendants' publications were not a "fair abridgment" of the proceeding. "'[I]t is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it." *Solaia*, 221 Ill. 2d at 590 (quoting Restatement (Second) of Torts § 611, Comment *f* (1977)). The reporter is not permitted "to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to anyone, nor to indict expressly or by innuendo the veracity or integrity of any of the parties." *Id*. This is precisely what Defendants did. Were Defendants' publications actually about the official proceeding, they would have no need to mention Mr. Soloway. Mr. Soloway never appeared in the case and his name does not appear anywhere in conjunction with the docket or the contempt order. App. 9-10 at ¶ 31; App. 11 at ¶ 37. Defendants not only added Mr. Soloway to their reporting of the proceeding, they also directly tied Mr. Soloway's departure from Cushman to the contempt order and the court's "rebuke." App. 38. Such an unwarranted addition "convey[s] a defamatory impression" and indict[s] "by innuendo" Mr. Soloway's veracity and integrity. *Solaia*, 221 Ill. 2d at 590. The example of an inaccurate and unfair report used in the

Restatement perfectly describes Defendants' defamatory publications about Mr. Soloway: "the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article." Restatement (Second) of Torts § 611, Comment *f* (1977). Defendants' publications were both inaccurate and unfair and cannot be protected by the fair report privilege.

As one court aptly put it, "[w]hile information may be made available to the public for purposes of ensuring fairness in our judicial proceedings, there may be legal consequences should that same information be published and distributed as clickbait to millions of people on the internet in a manner that defames or invades the privacy of another." *Yount v. Handshoe*, 171 So. 3d 381, 390 (La. App. 5 Cir. 5/28/15). Defendants' publications were never about reporting on an official proceeding to educate the public. Any such reporting about the proceeding was condensed into a sensationalized headline with the sole purpose of linking Mr. Soloway to a scandalous situation in order to generate internet traffic.

## D. Defendants' Publications Caused Damages

Mr. Soloway does not need to establish specific proof of damages because the defamatory publications fall within the five categories of statements that Illinois deems defamatory *per se* and therefore harm or damages are presumed. *L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1129 (7th Cir. 2022). The defamation *per se* categories are words imputing to a person: (1) a commission of a crime, (2) a "loathsome communicable disease," (3) a person's inability to perform or lack of integrity in performing employment duties, (4) adultery or fornication, and (5) that the person lacks ability in his profession or the words otherwise prejudice the person in his profession. *Solaia*, 221 Ill. 2d at 580.

In this case, Defendants' publications about Mr. Soloway constitute defamation *per se* as they fall under two different defamation categories: first, they impute Mr. Soloway's inability to perform or lack of integrity in performing employment duties; and second, they impute that Mr. Soloway lacks ability in his profession or otherwise prejudice Mr. Soloway in his profession. The District Court correctly identified these two categories as relevant to Defendants' publications about Mr.

Soloway. RSA 6. The April Article insinuates that Mr. Soloway was "replaced" (*i.e.,* removed) "in the wake of" (*i.e.,* because of) a negative legal proceeding involving the Trump Organization where Cushman was "rebuked." App. 38. The April Article thus imputes an "inability to perform" Mr. Soloway's "employment duties" and that Mr. Soloway lacks ability in his profession. *Id.*; *Solaia*, 221 Ill. 2d at 580. In describing these categories of defamation *per se*, this Court explained that qualifying defamatory statements are those "related to job performance; to succeed, the plaintiff must have been accused of lacking *ability in his trade* or doing something bad *in the course of carrying out his job.*" *Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005) (emphasis in original). That is precisely what Defendants' publications imputed.

## II. THE PUBLICATIONS ARE NOT PROTECTED BY THE INNOCENT CONSTRUCTION RULE

The basis for the District Court's grant of Defendants' Motion to Dismiss was that Defendants' publications about Mr. Soloway were not defamatory *per se* because they fell under the innocent construction rule. RSA 9-15. The District Court determined that a "reasonable reader" could read the article innocently as follows:

[T]hat plaintiff left Cushman eight months after the contempt holding in the *Trump Organization* litigation, that the contempt holding was lifted before plaintiff's departure, and that plaintiff's exit was neither mentioned in Cushman's press release nor did his biography remain on Cushman's website.

RSA 9. The District Court did not properly apply the innocent construction rule. Properly applied, the innocent construction rule fails to shield Defendants' publications about Mr. Soloway. As such, this Court should reverse the District Court's ruling to the contrary.

Illinois' innocent construction rule bars a claim for defamation *per se* if the defamatory statement "is reasonably capable of an innocent construction." *Green v. Rogers*, 234 Ill. 2d 478, 499 (2009). Under this rule, a court must give the defendant's words their natural and obvious meaning, after having considered "both the substance of defendant's alleged statements and the context in which they allegedly were made." *Id.* at 501. "[I]f a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 925 (7th Cir. 2003) (citing *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399 (1996)). Nevertheless, "when the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an

inoffensive gloss on the statement." *Green*, 234 Ill. 2d at 500; *see also*

*Tuite v. Corbitt*, 224 Ill. 2d 490, 512 (2006) ("if the likely intended

meaning of a statement is defamatory, a court should not dismiss the

plaintiff's claim under the innocent construction rule.") Additionally,

Illinois no longer requires that "if the statement is *capable* of being read

innocently it *must* be so read;" rather, the standard is whether the

statement "*may* reasonably be innocently interpreted." *Action Repair,*

*Inc. v. American Broadcasting Companies, Inc.*, 776 F.2d 143, 148 (7th

Cir. 1985) (emphasis in original); *see also Giant Screen Sports v.*

*Canadian Imperial Bank of Commerce*, 553 F.3d 527, 534 (7th Cir.

2009) (noting that Illinois law rejects attempts to imagine innocent

explanations of plainly defamatory statements).

When a court applies the innocent construction rule, the court

generally considers the entire publication, *i.e.*, headlines must be

considered alongside the accompanying article and not in isolation. *See,*

*e.g.*, *Harrison v. Chi. Sun–Times, Inc.*, 341 Ill. App. 3d 555, 570 (2003)

("As a general rule in applying the innocent construction rule, a

newspaper headline and the text of the article to which it refers are to

be considered as one document and read together as a whole."). As the District Court explained:

> Even if a reader were to understand the headline to imply that plaintiff was fired because of the contempt holding, that misconception would be cured once the reader read the actual article and learned that Cushman publicly defended the manner in which its attorneys responded to the subpoenas in the *Trump Organization* litigation; the initial contempt holding was later set aside by another court; and after it was set aside, plaintiff departed Cushman for unannounced reasons.

RSA. 10-11. What the District Court failed to recognize was that the "reasonable reader" would never have read the entire article because the article was locked behind a paywall.

## A. Defendants' Publications Cannot Be Innocently Construed Because Only the Headline and Byline Were Publicly Available

Few Americans do more than read the headline of an article. In a study conducted by the American Press Institute, only "4 in 10 Americans report[ed] that they delved deeper into a particular news subject beyond the headlines in the last week." App. 124 (AMERICAN PRESS INSTITUTE, *How Americans Get Their News* (Mar. 17, 2014), *available at* https://americanpressinstitute.org/how-americans-get-news/). This societal reality is aptly explained by the Restatement of Torts in the context of defamation.

In determining the meaning of a communication, words, whether written or spoken, are to be construed together with their context . . . The context of a defamatory imputation includes all parts of the communication that are ordinarily heard or read with it. Circumstances in various types of situations determine the extent of the context of the imputation complained of. Thus, the text of a newspaper article is ordinarily not the context of the headline, although it may explain or qualify a defamatory imputation conveyed when the headline alone is read. This is true because the public frequently reads only the headlines of a newspaper or reads the article itself so hastily or imperfectly as not to realize its full significance. On the other hand, the entire contents of a personal letter are considered as the context of any part of it because a recipient of the letter ordinarily reads the entire communication at one time.

Restatement (Second) of Torts § 563, Comment *d* (1977). Nearly 70-years ago, the Nevada Supreme Court understood this problem and correctly explained that a headline can, in and of itself, create a claim for defamation. "The text of a newspaper article is not ordinarily the context of its headline, since the public frequently reads only the headline." *Las Vegas Sun, Inc. v. Franklin*, 74 Nev. 282, 287 (1958) (citations omitted). Like the Defendants' Articles, "[t]he defamation of Franklin contained in the headline was complete upon its face. It was not necessary to read the article in order that the defamatory nature of the statement be understood or connected with Franklin." *Id.*

The primacy of a headline for most readers is redoubled by the fact that many online news articles—including Defendants' publications about Mr. Soloway—are locked behind a paywall, making the only publicly-accessible content the headline itself. Several courts across the country have considered this problem and have correctly determined that when the "context" for a headline is locked behind an obstacle, the headline is all that will be consumed and the unavailable context cannot realistically cure the defamatory content of the headline.

For example, in *Solano v. Playgirl, Inc.*, 292 F.3d 1078 (9th Cir. 2002), the actor Jose Solano, Jr ("best known for his role as 'Manny Gutierrez' on the syndicated television program 'Baywatch' from 1996 to 1999") appeared "shirtless and wearing his red lifeguard trunks" on the cover the January 1999 issue of Playgirl magazine. *Id*. at 1080. The cover of the magazine, which was dominated by Solano's shirtless portrait, proclaimed a variety of content inside:

> In the upper left corner was a red circle containing the words, "TV Guys," followed by the headline, "Primetime's Sexy Young Stars Exposed," which ran across the top of Solano's head. Immediately to the left of Solano's picture, the magazine proclaimed, "12 Sizzling Centerfolds Ready to Score With You." The "s" in "Centerfolds" was superimposed on Solano's right shoulder. Also placed to the left of Solano, running down the left margin, the cover touted "Countdown

> to Climax: Naughty Ways to Ring in the New Year," "Toyz in the Hood: The Best in Erotic Home Shopping" and "Bottoms Up!: Hot Celebrity Buns." In the cover's lower right hand corner was the headline, "Baywatch's Best Body, Jose Solano."

*Id*. at 1081. Notably, the magazine was "displayed on newsstands packaged in plastic wrap to prevent potential customers from flipping through the pages to view the magazine's contents." *Id*. Put another way, a reader would need to purchase a copy of the magazine in order to obtain the "sizzling centerfolds" and other promised material; otherwise, the reader's only information would be Solano's picture and the eye-catching headlines. Solano rightly contended that "his bare-chested, three-quarter-length photograph alongside the suggestive headlines on the Playgirl cover" insinuated that the reader would find nude pictures of Solano inside the magazine. *Id*. at 1083. In reality, "Solano's sole appearance inside the magazine was on page 21, in a quarter-page, head-and-shoulders photograph—showing him fully dressed in a tee shirt and sweater—alongside a brief, quarter-page profile of the actor." *Id*. at 1081. The Court ruled that "when we recall that the magazine is displayed for sale in plastic wrapping, making the cover the key to what a reader can expect to find inside the magazine,"

"a jury reasonably could conclude that the Playgirl cover conveyed the message that Solano was . . . willing to—or was 'washed up' and had to—sell himself naked to a women's sex magazine." *Id*. at 1084.

The logic of *Solano*—that misleading headlines or covers that make false insinuations about what is inside can constitute actionable conduct that cannot be cured by hidden, unavailable context—is applicable to the present case. For the majority of readers who would have encountered the April Article, the only information they would have seen was that Cushman "replaced" Mr. Soloway "in [the] wake of" Cushman's "rebuke by Judge [Engoron] in [the] Trump Probe" and that Cushman "didn't explain the departure of GC Brett Soloway, who has been removed from the company's website." App. 38. The rest of the April Article was hidden from the majority of readers behind a paywall. App. 14 at ¶ 48. Unlike the circumstances in *Huon v. Denton*, where "the complaint indicate[d] that the headline and article were directly adjacent to one another," Defendants' publications did not have any salutary context available for review making *Solano* an apt comparison. *Huon v. Denton*, 841 F.3d 733, 739 (7th Cir. 2016) (declining to follow *Solano*, in part, because it was factually distinguishable). Even if a

reader was able to access the remainder of the April Article, that content did nothing to mitigate or counter the defamatory headline and byline.

## B. Even Considering Defendants' Publications as a Whole, They Cannot Be Innocently Construed Because They Defame By Implication

The innocent construction rule requires that when the defamatory statement is "considered in context," "the words and the implications therefrom [must be] given their natural and obvious meaning[.]" *Chapski v. Copley Press*, 92 Ill. 2d 344, 352 (1982). If the "natural and obvious" implication is defamatory, it will defeat the innocent construction. *Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 742 F. Supp. 1359, 1371–72 (N.D. Ill. 1990) (ruling that the plaintiff's "circumstances do not establish the ineluctable defamatory implication necessary to avoid the innocent construction rule"). The seminal *Solaia* case is instructive. In *Solaia*, the defendant published an article titled "Conspiracy of a Shakedown," which outlined the complaint and stated, in relevant part,

> "Rockwell filed its complaint under federal antitrust laws: the Sherman Antitrust Act, the Clayton Act, and Lanham Act." [The defendant] then added, "The Sherman Antitrust Act outlaws all contracts, combinations, and conspiracies

that unreasonably restrain interstate and foreign trade. * * * *
*The Sherman Act also makes it a crime to monopolize or*
*conspire with any person or persons to monopolize any part of*
*trade or commerce.*" (Emphasis added.) The appellate court
correctly characterized the statement as substantially true,
but the plaintiffs did not challenge the veracity of this
statement standing alone. Instead, they challenged the
veracity of the implication left by the statement, namely,
they had committed a crime.

*Solaia*, 221 Ill. 2d at 593. The *Solaia* court held that "[t]he natural and

obvious implication of this statement is that the plaintiffs committed a

crime," and, as such, "there is no innocent construction for this

statement." *Id*. at 594. The *Solaia* court's rebuke of the defendant's

implications makes a striking parallel to Defendants' publications about

Mr. Soloway. The defendants asserted that statement implying

commission of a crime was "'a summary for manufacturing company

executives who constitute Start's readership of the basic provisions of

the federal antitrust laws,'" but the defendants failed to explain "why

this summary did not include references to other provisions more

relevant to Rockwell Automation's complaint[.]" *Id*. Mr. Guzman, the

author of the April Article, "covered the arrivals and departures of chief

legal officers at large firms like Cushman." App. 53. Why would Mr.

Guzman spend significant time summarizing a court proceeding if he

was simply reporting on the arrival and departure of Cushman's general counsel? Because Mr. Guzman wanted to draw a causal connection between the contempt order and Mr. Soloway's departure. But the Cushman contempt order occurred in July 2022 and was resolved in August 2022—eight months before Defendants published the April Article. App. 9-11 at ¶¶ 31-38. By any measure, the contempt order was no longer newsworthy. What was "newsworthy" was a clickbait headline that implied that Cushman fired Mr. Soloway because of a judicial rebuke in the form of a contempt order in a "Trump probe." The natural and obvious implication of the April Article, even read as a whole, was that Mr. Soloway was terminated because of his mishandling of Cushman's subpoena response which resulted in a contempt order by a court in a highly-publicized case involving President Trump.

Defendants have argued that their publications should be innocently construed because "they innocuously and truthfully report" two facts: (1) that Cushman replaced Mr. Soloway with a new general counsel and (2) the replacement happened eight-months after the contempt order. App. 60. Yet the publications' juxtaposition of two facts

together does not mean the publications are innocent. Quite the opposite. "It is well settled that the 'arrangement and phrasing of apparently nonlibelous statements' cannot hide the existence of a defamatory meaning." *Church of Scientology of Cal. v. Flynn*, 744 F.2d 694, 696 (9th Cir. 1984). This Court recently determined that the implication of telling a third party that an entity had failed or refused to make an installment payment meant that the allegedly breaching party's "contractual word to meet an obligation is meaningless" and the party "lack[ed] [] financial integrity." *Giant Screen Sports*, 553 F.3d at 533-34 (explaining that Illinois' innocent construction rule "does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable . . . It also does not require courts to espouse a naïveté unwarranted under the circumstances.") (internal citations and quotations omitted).

"When a reader, 'connecting the dots,' could reasonably arrive at the implication, the author may be accountable." *Nunes v. Lizza*, 12 F.4th 890, 897 (8th Cir. 2021). Courts across the country agree that actionable defamation can lie in the interstices of facts—in the implication. *Price v. Stossel*, 620 F.3d 992, 1003-04 (9th Cir. 2010) ("If

the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or otherwise creates a defamatory implication, he may be held responsible for the defamatory implication, even though the particular facts are correct.") (citations and quotations omitted); *Johnston v. Borders*, 36 F.4th 1254, 1275 (11th Cir. 2022) ("Even if the words are not literally false, they may still be defamatory if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts.") (citations and quotations omitted); *White v. Fraternal Ord. of Police*, 909 F.2d 512, 522–23 (D.C. Cir. 1990) ("What the district court and the FOP apparently fail to understand is that it is the defamatory *implication* —not the underlying assertions giving rise to the implication—which must be examined to discern whether the statements are entitled to full constitutional protection."); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1196–97 (10th Cir. 2007) ("[L]iability can be found if the publication gets the facts right but the 'gist' wrong . . 'if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the

defamatory implication[.]'") (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 116A, Supp. at 117 (W. Page Keeton ed., 5th ed.1984, Supp.1988)).

This Court must "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo*, 526 F.3d at 1081. Drawing all possible inferences in Mr. Soloway's favor, Defendants' publications cannot be innocently construed. The unnecessary juxtaposition of an eight-month-old contempt order with Mr. Soloway's replacement as General Counsel creates the natural and obvious suggestion that Cushman fired Mr. Soloway because of his mishandling of Cushman's involvement in the "Trump probe" and the subsequent "rebuke" by the court in the form of the contempt order.

There is no need to "strain to see an inoffensive gloss on the statement" because Defendants' publications "clearly intended and unmistakably conveyed a defamatory meaning." *Solaia*, 221 Ill. 2d at 580. Yet that is precisely what the District court did. The District Court went to great lengths to find precedent that suggests a court should ignore all defamatory implications. For example, the District Court

noted that "[i]f the actual words spoken do not by themselves denote criminal (or unethical) conduct and in common usage have a more flexible and broader meaning than ascribed by plaintiff, then, as a matter of law, the words are nonactionable as defamation *per se*." RSA 7 (citing *Harris Tr. & Sav. Bank v. Phillips*, 154 Ill. App. 3d 574, 581 (1st Dist. 1987)). But the Illinois Supreme Court disagreed with *Harris Trust* in *Mittelman v. Witous*, finding that "a plaintiff can always seek to establish a *per quod* action in an attempt to avoid the innocent construction rule by utilization of extrinsic facts to establish the defamatory nature of a statement not otherwise facially defamatory." 135 Ill. 2d 220, 233 (1989)[2]. The District Court also relied on *Levinson v. Time, Inc.*, 89 Ill. App. 3d 338, 342 (1st Dist. 1980) and *Glassman v. Metro. Life Ins. Co.*, 616 F. Supp. 145, 147 (N.D. Ill. 1985) for the proposition that the statements must be read "stripped of innuendo." RSA 7, 15. But innuendo is different than "implicitly" suggesting

---

[2] *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 156 Ill. 2d 16, 30 (1993) abrogated only the portion of *Mittelman* regarding the standards related to qualified privilege ("[w]e now hold that to prove an abuse of the qualified privilege, the plaintiff must show a direct intention to injure another, or a reckless disregard of [the defamed party's] rights and of the consequences that may result to him.") and not its discussion of the innocent construction rule. *Id.* (internal citations and quotations omitted).

something that is defamatory *per se*. "Implicit" accusations have been found sufficient for defamation *per se. See, e.g., Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 14 (1992) ("Taken together with all of the prior remarks, Tim Disa's statement reinforced the preceding implication that Kolegas and the festival were frauds.").

Additionally, *Levinson*'s discussion of the innocent construction rule is no longer good law. The notion that "words allegedly libelous that are capable of being read innocently must be so read" (*Levinson*, 89 Ill. App. 3d at 342) is not the rule, as this Court explained forty years ago. *Action Repair, Inc.*, 776 F.2d at 148 ("We disagree with this analysis. It is a strained interpretation along the lines of the old innocent construction rule ('if the statement is *capable* of being read innocently it ***must*** be so read')".) (emphasis in original). The District Court's forced application of outdated case law has led to precisely the problem the *Chapski* court lamented when they modified the innocent construction rule: "[c]ourts generally strain to find unnatural but possibly innocent meanings of words where such a construction is clearly unreasonable and a defamatory meaning is far more probable." *Chapski*, 92 Ill. 2d at 350-51. This is why Illinois courts reject attempts

to imagine innocent explanations of plainly defamatory statements. *Tutie*, 224 Ill. 2d at 504-05.

Moreover, the District Court refused to engage at all with the seminal Illinois case on defamation *per se* and the innocent construction rule: *Chapski v. Copley Press,* 92 Ill. 2d at 345 (1982). *Chapski* undermines the District Court's strained efforts to find a non-defamatory meaning in the present case. As the *Chapski* court explained, "[t]o construe a publication in an unreasonable manner in order to give it an innocent interpretation is itself incompatible with the rule's requirement that words be given their 'natural and obvious meaning.'" *Id.* at 351.

Finally, and most concerningly, the District Court gave a simple recitation of the motion to dismiss standard but refused at each stage of the analysis to actually apply the standard. RSA 5-6. For example, had the District Court properly viewed "all plausible inferences in the light most favorable to the plaintiff" (RSA 5), it is difficult to see how the District Court could reasonably ignore the fact that the paywall made the April Article's headline and byline the only publicly available information. And it is similarly implausible for the District Court to

decide that the most likely reading of the headline and byline was that "that plaintiff left Cushman eight months after the contempt holding in the *Trump Organization* litigation[.]" RSA 9. That is not a natural and obvious reading. The false connection is apparent—Mr. Soloway was replaced as a result of the "Trump probe." Any other interpretation is an unlikely stretch and unintended which is why the innocent construction rule does not apply.

Applying correct precedent, construing the complaint in the light most favorable to Mr. Soloway, drawing all possible inferences in Mr. Soloway's favor, and not engaging in "mental gymnastics" to "find the most innocent possible message," it is clear that this Court should reverse the District Court's ruling that the Defendants' publications were protected by the innocent construction rule. *MFB Fertility Inc. v. Action Care Mobile Veterinary Clinic LLC*, 730 F. Supp. 3d 740, 753 (N.D. Ill. 2024).

## III. DEFENDANTS' PUBLICATIONS ABOUT MR. SOLOWAY ALSO CONSTITUTE DEFAMATION *PER QUOD*

Even if Defendants' publications about Mr. Soloway do not constitute defamation *per se*, they do constitute defamation *per quod*. The District Court incorrectly ruled that Mr. Soloway's complaint failed to state a claim for defamation *per quod*. RSA 19.

A claim for defamation *per quod* requires the same elements as defamation *per se*—(1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication of that statement to a third party, and (3) the publication caused the plaintiff damages—as well as the additional element of special damages. *See Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1102-03 (N.D. Ill. 2016). Special damages in this context are "actual damages of a pecuniary nature." *Hill v. Schmidt*, 2012 IL App (5th) 110324, ¶ 25 (2012). A cause of action for defamation *per quod* may exist "where the defamatory character of the statement is not apparent on its face" but "extrinsic circumstances [] demonstrate its injurious meaning." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 103 (1996).

The District Court held that Mr. Soloway's defamation *per quod* claim failed because "plaintiff's claim—by its very nature—is one of

defamation *per se*, rather than defamation *per quod*" and the extrinsic facts pled in the complaint fail to "'establish[] that [defendants' article] was interpreted as being defamatory' by its readers." RSA 17-18 (quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416 (1996)). Further, the District Court held that Mr. Soloway's allegations of pecuniary damages were insufficient because Mr. Soloway failed to "allege that plaintiff's article caused him to be denied any one specific job that would have earned $2 million annually." RSA 18-19.

## A. Mr. Soloway Pled Sufficient Extrinsic Facts to State a Claim for Defamation *Per Quod*

First, Mr. Soloway was not required to plead extrinsic facts to support a defamation *per quod* claim if "the statement is defamatory on its face, but does not fall within one of the limited categories of statements that are actionable *per se*." *Tunca v. Painter*, 2012 IL App (1st) 093384, ¶ 41 (2012) (citing *Bryson,* 174 Ill. 2d at 103).

Second, even if Defendants' publications were not facially defamatory, Mr. Soloway pled sufficient extrinsic facts for his defamation *per quod* action to survive a motion to dismiss. An example of the type of extrinsic facts, or innuendo, is helpful:

> [A] statement that the plaintiff has burned his own barn is not defamatory on its face, since he was free to do so; but when it is pleaded as inducement that he had insured his barn and as innuendo that the words were understood to mean that he was defrauding the insurance company, a charge of the crime of arson is made out, which is defamatory.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 111 at 782 (5th ed.1984). Put simply, defamation *per quod*—or defamation "with explanation"—requires factual allegations that show "the defamatory character of a statement that is otherwise innocent on its face." *Quinn v. Jewel Food Stores,* 276 Ill. App. 3d 861, 869 (1995).

As explained above in Section II.B, the defamatory character of Defendants' publications stems from the juxtaposition of two allegedly innocent statements: (1) that Cushman replaced Mr. Soloway with a new general counsel and (2) the replacement happened after the contempt order. RSA 38. Much like the example provided by Prosser and Keeton, Defendants' publication would be non-defamatory if it simply reported that Cushman replaced Mr. Soloway with a new general counsel. However, by directly linking Mr. Soloway's removal with the contempt order, it is now understood by implication that Mr. Soloway was terminated by Cushman because of his professional failure

regarding the contempt order. This was plead in the Complaint. *See, e.g.,* App. 13, 16-17, 19, 27 at ¶¶ 43-44, 55, 57, 64, 92-93; App. 38. Construing Mr. Soloway's allegations in the light most favorable to him and "accepting as true all well-pleaded facts alleged," it is clear that Mr. Soloway pled sufficient extrinsic facts for his defamation *per quod* claim to survive a motion to dismiss. *Tamayo*, 526 F.3d at 1081.

### B. Mr. Soloway Pled Sufficient Allegations of Special Damages to State a Claim for Defamation *Per Quod*

Contrary to the District Court's cursory rejection, Mr. Soloway did provide sufficient allegations of specific damages. Special damages are "pecuniary losses and damage to the plaintiff's reputation resulting from defendants' defamatory statements." *Tunca*, 2012 IL App (1st) 093384, ¶ 60 (citing *Bryson,* 174 Ill. 2d at 103-04). "'[A]n allegation of special damages is sufficient when it notifies the defendant of the nature of the claimed damages even though it does not delineate them with as great precision as might be possible or desirable.'" *Morton Grove Pharms., Inc. v. Nat'l Pediculosis Ass'n, Inc.*, 494 F. Supp. 2d 934, 941 (N.D. Ill. 2007) (quoting *Cont'l Nut Co. v. Robert L. Berner Co.,* 345 F.2d 395, 397 (7th Cir.1965).

Mr. Soloway alleged that, based on "multiple discussions concerning his candidacy for certain General Counsel or Chief Legal Officer opportunities," Defendants' publications have caused him to lose employment opportunities. App. 30 at ¶ 102. Mr. Soloway alleged, in detail, how two executive recruiting firms refused to help Mr. Soloway in his employment search because of the April Article. App. 31-32 at ¶¶ 105-108. Mr. Soloway alleged that during an interview with an in-house hiring recruiter, who was clearly interested in hiring Mr. Soloway, that he observed the recruiter read the headlines of the Defendants' publications and that based on those publications the recruiter subsequently rejected Mr. Soloway's employment application. App. 32 at ¶ 110. Third parties grasped the defamatory meaning, which led them to have a diminished view of Mr. Soloway's professional standing and deterred them from associating with him for employment discussions. This is textbook defamation. *See Kolegas*, 154 Ill. 2d at 14 ("We conclude that the Disas' statements are defamatory *per se,* because . . . they imputed that Kolegas lacked integrity in carrying out his professional duties and prejudiced Kolegas in his business[.]").

Finally, Mr. Soloway alleged that he is losing $2 million per year, which was his previous compensation and expected salary for a new position, because Defendants' publications have hindered his efforts secure employment. App. 33-34 at ¶¶ 114-115. Anytime an employee is portrayed as being involuntarily terminated, some stigma attaches to influence future employment opportunities. This is exactly what happened to Mr. Soloway, as he pled.

A survey of Illinois cases finding sufficient allegations of special damages demonstrates that Mr. Soloway adequately pled special damages. In *Tunca*, 2012 IL App (1st) 093384, ¶ 62, the court held that the plaintiff surgeon's allegation that accusations of medical malpractice caused an $861,506 decrease in his income and a 25% drop in his referrals was sufficient to support a claim of defamation *per quod*. In *Becker v. Zellner*, 292 Ill. App. 3d 116, 127 (1997), the court found sufficient the plaintiff's allegation that a third party stopped doing business with them because of the defendant's defamatory statements. In *Halpern v. News-Sun Broadcasting Co.*, 53 Ill. App. 3d 644, 653 (1977), the court found sufficient the plaintiff's allegation that "it ha[d] lost income and continue[d] to lose income as a result of

patients leaving the [nursing] home and other patients removing their applications." And in *Windsor Lake, Inc. v. WROK,* 94 Ill. App. 2d 403, 408–09 (1968), the court found that a plaintiff sufficiently plead special damages by explicitly stating the dollar amount of his loss of revenue which resulted from the loss of customers due to defendants' statements.

*Imperial Apparel* is instructive about the standard of specificity required for special damages. In that case, where the defendant had defamatory material about plaintiff's business published in a newspaper, the court found that the plaintiff sufficiently alleged special damages by stating in its complaint that its sales decreased from the month preceding defendant's defamatory statement and as compared to the same period in the prior year. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,* 367 Ill. App. 3d 48, 59 (2006), *rev'd on other grounds.* The court explained that "[w]hile we have no quarrel with the proposition that a plaintiff in a *per quod* action must plead special damages with specificity, we nevertheless believe that a plaintiff is only obligated to be as specific as it is reasonable to require." *Id.*

Mr. Soloway pled a specific amount of lost revenue, *i.e.*, his employment income, because of Defendants' publications. App. 33-34 at ¶¶ 114-115. Mr. Soloway pled a specific job loss as a result of Defendants' publications. App. 32 at ¶ 110. And Mr. Soloway pled the inability to obtain employment because of Defendants' publications after losing out on "many in-house legal executive positions" and being summarily rejected by two different executive recruiting agencies. App. 30-33 at ¶¶ 102, 105-108, 111. These allegations "notifie[d] the defendant of the nature of the claimed damages" and that is sufficient at the motion to dismiss stage. *Morton Grove*, 494 F. Supp. 2d at 941; *Becker*, 292 Ill. App. 3d at 127. It is unreasonable to require more from Mr. Soloway when he cannot calculate the full extent of the defamatory impact of Defendants' publications that were disseminated online for innumerable people to see. For example, the District Court rejected Mr. Soloway's special damages allegation because Mr. Soloway did "not allege that plaintiff's article caused him to be denied any one specific job that would have earned $2 million annually." RSA 19. But that is not what Illinois requires. *See, e.g., Tunca*, 2012 IL App (1st) 093384 ¶¶ 61-62. Mr. Soloway's experience and success as a general counsel would

earn him around $2 million annually at any comparable position. Moreover, as Mr. Soloway often never made it past the first round of the application process, it strains credulity to require him to identify the specific salary he would have obtained since salary negotiations are often the final part of the hiring process.

Construing Mr. Soloway's special damages allegations in the light most favorable to him and "accepting as true all well-pleaded facts alleged," it is clear that Mr. Soloway pled sufficient allegations of special damages to survive a motion to dismiss. *Tamayo*, 526 F.3d at 1081. There was no need for Mr. Soloway to amend his complaint and the District Court's ruling dismissing Mr. Soloway's claim of defamation *per quod* should be reversed.

## IV. DEFENDANTS' PUBLICATIONS ARE NOT PRIVILEGED OR PROTECTED

The Defendants have also alleged that their publications about Mr. Soloway are not defamatory because they are (1) protected opinions and (2) substantially true. Neither of these defenses are viable—a conclusion that the District Court already suggested. The District Court found that these defenses were "not at this time persuasive to the court." RSA 19 at Fn. 6. The District Court explained that:

> [O]pinions are only protected when they "cannot reasonably
> be interpreted as stating actual facts about the plaintiff,
> when viewed from the perspective of an ordinary reader."
> *Doctor's Data Inc.*, 170 F. Supp. 3d at 1113. Nowhere in the
> article do defendants clearly express a subjective view or
> interpretation. *Id.* Therefore, an ordinary reader could
> reasonably interpret the article as stating actual facts about
> the plaintiff. Finally, the question of substantial truth is
> typically reserved for the jury. *Ludlow v. Northwestern
> Univ.*, 79 F. Supp. 3d 824, 837 (N.D. Ill. 2015). In any event,
> defendants make clear that their substantial truth defense
> "goes hand-in-hand with their opinion argument," [26] at 9,
> so the Court declines to address it at this time. Defendants
> are free to raise these defenses in future motions.

*Id*. Since Defendants are likely to re-raise these issues on appeal, it is

worth briefly explaining why the District Court was correctly inclined to

disregard these defenses.

## A.    The Publications Are Not Protected Opinions

To qualify as an expression of pure opinion, a statement "cannot

be reasonably interpreted as stating actual fact." *Solaia*, 221 Ill. 2d at

581. If a statement of opinion "impl[ies] an assertion of objective fact,"

even in part, it remains subject to a potential defamation claim. *See

Dubinsky v. United Airlines Master Exec. Couns.*, 303 Ill. App. 3d 317,

324 (1999). Whether a statement is an opinion or a fact is a question of

law. *Owen v. Carr,* 113 Ill. 2d 273, 279 (1986). There are four points of

analysis when determining whether a defamatory statement is a

protected opinion: the "(1) precision of the statement; (2) verifiability of the statement; (3) literary context of the statement; and (4) public and social contexts of the statement." *Moriarty v. Greene*, 315 Ill. App. 3d 225, 234–35 (2000). If it is clear that the writer is exploring a "subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993).

Defendants' repeatedly conceded that their publications about Mr. Soloway were statements of fact and not opinion: (1) describing the articles as "a straightforward report" (App. 107), (2) "each fact in this publicly available squib [the headline and byline of the April Article] is entirely accurate" (App. 108), (3) describing the summary of the judicial proceeding as "accurate" (App. 114), (4) describing any protected opinion as "based on clearly disclosed true facts" (*id.*), and (5) describing the April Article as disclosing "true facts" (App. 115). Defendants attempt to evade this issue by focusing their opinion defense on the defamatory inference their reporting created: "[f]rom these facts, it is logical to speculate that Plaintiff lost his job at least in part due to his handling of

the Cushman Contempt Proceedings. And any expression of that speculation in the Articles is opinion, pure and simple." App. 66. However, Defendants' contortions are unavailing.

First, "a defamatory statement is constitutionally protected *only if it cannot be reasonably interpreted as stating actual fact.*" *Solaia*, 221 Ill. 2d at 581 (emphasis added). Defendants have already conceded that the published statements assert actual facts.

Second, the Illinois opinion factors demonstrate that Defendants' defamatory statements by implication cannot be an opinion. (1) the implication is imprecise precisely because it is not a statement but is rather an implication; (2) the implication that Mr. Soloway was terminated because of the contempt order is verifiable—both Mr. Soloway and Cushman's Chief Marketing & Communications Officer told Defendants in August 2023 that any link between Mr. Soloway's departure and the contempt order is false and inaccurate (App. 23 at ¶¶ 79-81); (3) the defamatory statements were made in the literary context of a legal news publication (*i.e.*, Law.com) by a reporter who simply "covered the arrivals and departures of chief legal officers at large firms like Cushman" (App. 53) as opposed to, for example, an editorial; and

(4) public and social contexts of the statement are largely non-existent as Defendants' publications reported on a general counsel with no previous online presence let alone public notoriety. App. 11 at ¶ 37. Defendants' publications are not opinions, and they cannot escape liability by attempting to convert their "straightforward report" of "clearly disclosed true facts" into an opinion. (App. 107, 114).

## B. The Substantial Truth Defense Does Not Protect Defendants' Publications

Defendants' defamatory publications are not protected by the substantial truth defense.

While truth is an absolute defense to defamation, the defendant need only establish "substantial truth." "Such demonstration is made where the defendant shows that the 'gist' or 'sting' of the allegedly defamatory material is true. The 'gist' or 'sting' of the alleged defamation means the heart of the matter in question—the hurtfulness of the utterance." *Andrews v. At World Properties, LLC*, 2023 IL App (1st) 220950, ¶ 16 (2023) (internal citations omitted).

First, the "gist" or "sting" of the defamatory statement is that Mr. Soloway was terminated from his employment by Cushman due to his failures relating to the contempt order issue in the "Trump Probe." This

"heart of the matter" is indisputably false. Mr. Soloway was never terminated and his departure had nothing to do with the contempt order issued against Cushman—a fact that Cushman repeatedly told Defendants and which Defendants ignored. App. 12-13 at ¶¶ 41-42; App. 22-23 at ¶¶ 77, 81. Since the defamatory content—both from an explicit and implicit perspective—is *not* substantially true, Defendants' publications about Mr. Soloway remain defamatory and actionable.

Second, as the District Court rightly noted, the substantial truth defense is normally a jury question. RSA 19 at Fn. 6. It only becomes a legal question capable of resolution by the court when "any reasonable jury would have to find that the substantial truth of the material had been established." *Kopolovic v. Shah*, 2012 IL App (2d) 110383, ¶ 43 (2012). For the reasons explained above, a reasonable jury could easily reject Defendants' substantial truth defense and, therefore, it is a question best left for the jury to decide.

## CONCLUSION

For the reasons set forth above, Mr. Soloway respectfully asks this Court to (1) reverse the District Court's Orders granting Defendants' Motion to Dismiss and dismissing both Mr. Soloway's defamation *per se* and defamation *per quod* claims with prejudice and (2) remand this case to the District Court for further proceedings.

March 3, 2025

Respectfully submitted,

/s/ *Nicole E. Wrigley*
Nicole E. Wrigley
Patrick J. Beisell
Benesch, Friedlander, Coplan &
Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: 312.212.4949
Facsimile: 312.767.9192

*Attorneys for Plaintiff-Appellant*
*Brett Soloway*

## CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies that Plaintiff-Appellant's Opening Brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) for a brief produced with a proportionally spaced font. The brief contains 12,442 words (excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(f)).

/s/ *Patrick J. Beisell*
Patrick J. Beisell
Benesch, Friedlander, Coplan &
Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: 312.212.4949
Facsimile: 312.767.9192

*Attorney for Plaintiff-Appellant*
*Brett Soloway*

## CIRCUIT RULE 30(d) CERTIFICATION

In accordance with Circuit Rule 30(d), undersigned counsel hereby certifies that all materials required by Circuit Rules 30(a) and (b) are included in the separately filed Appendix.

/s/ *Patrick J. Beisell*
Patrick J. Beisell
Benesch, Friedlander, Coplan &
Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: 312.212.4949
Facsimile: 312.767.9192

*Attorney for Plaintiff-Appellant*
*Brett Soloway*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Patrick J. Beisell*
Patrick J. Beisell
Benesch, Friedlander, Coplan & Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: 312.212.4949
Facsimile: 312.767.9192

*Attorney for Plaintiff-Appellant Brett Soloway*

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

**Page**

Minute Order Granting Defendants' Motion to Dismiss and Dismissing Plaintiff's Complaint Without Prejudice, District Ct. Dkt. No. 39 (Oct. 18, 2024)...................................................................................RSA 1

Memorandum Opinion and Order on Defendants' Motion to Dismiss, District Ct. Dkt. No. 40 (Oct. 18, 2024).......................................RSA 2

Minute Order Converting Dismissal of Plaintiff's Complaint to One With Prejudice, District Ct. Dkt. No. 41 (Nov. 8, 2024).........................RSA 21

Civil Case Judgment, District Ct. Dkt. No. 42 (Nov. 8, 2024)..........RSA 22

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.1)**
**Eastern Division**

Brett Soloway

                              Plaintiff,

v.                                              Case No.: 1:24–cv–02925
                                                Honorable Georgia N Alexakis

ALM Global, LLC, et al.

                              Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Friday, October 18, 2024:

      MINUTE entry before the Honorable Georgia N Alexakis: For the reasons reflected in the accompanying memorandum opinion and order, defendants' motion to dismiss [16] is granted, and plaintiff's complaint [1] is dismissed without prejudice. Plaintiff has until 11/7/2024 to file an amended complaint consistent with the Court's analysis. Defendants' motion to stay discovery [17] is denied as moot. The status hearing set for 10/28/2024 [36] is vacated.(ca, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRETT SOLOWAY., | |
| Plaintiff, | |
| v. | No. 24 CV 2925 |
| ALM GLOBAL, LLC AND HUGO GUZMAN., | Judge Georgia N. Alexakis |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brett Soloway accuses publisher ALM Global, LLC, and reporter Hugo Guzman of publishing a defamatory article describing his exit as general counsel from real estate firm Cushman & Wakefield. [1]. Defendants ALM and Guzman ask the Court to dismiss plaintiff's complaint. [16]. Because the article is not defamatory as a matter of law, defendants' motion to dismiss is granted.

## I.  Factual Background

Plaintiff served as general counsel for Cushman & Wakefield between 2014 and 2023. [1] ¶ 14. In his capacity as general counsel, plaintiff "oversaw … all of Cushman's legal efforts," including litigation, and "oversaw outside counsel that Cushman hired for litigation matters." *Id.* ¶ 15. During plaintiff's tenure as general counsel, the New York Attorney General subpoenaed Cushman to produce documents in the *New York v. The Trump Organization, Inc., et al.,* litigation ("*Trump Organization* litigation"). *Id.* ¶ 30. In the summer of 2022, the trial court judge

presiding over the *Trump Organization* litigation criticized Cushman for "treat[ing] the looming [document production] deadlines cavalierly" and, in July 2022, held Cushman in contempt of court for failing to timely respond to the subpoena. *Id.* ¶ 31; [1-1] at 2. One month later, an appeals court lifted the contempt order. *Id.*

Seven months later, in March 2023, plaintiff "voluntarily resigned from Cushman on amicable terms." [1] ¶ 35; *see also id.* ¶ 4 ("[Plaintiff] departed Cushman on independent and friendly terms."). Then, on April 13, 2023, Cushman issued a press release announcing the arrival of its new general counsel. *Id.* ¶¶ 54-57; [1-1]. The press release mentioned neither plaintiff's name nor the reason for his departure. [1] ¶ 54; [1-1]. When Cushman released the press release, plaintiff's biography had been removed from the firm's website. *Id.* ¶¶ 54, 57.

The next day, April 14, 2023, defendant Guzman—a journalist for the legal publication Law.com, operated by defendant ALM—published an article with the headline "Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe." *Id.* ¶ 38. The other relevant portions of the article are as follows:

- The subheadline read, "The real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. It didn't explain the departure of GC Brett Soloway, who has been removed from the company's website." [1-1] at 2.

- An introductory section was titled "What You Need to Know" and referenced, in bullet points, Cushman's "long-standing relationship with the Trump Organization," the "deluge" of subpoenas Cushman had received from the New York Attorney General, the July 2022 contempt holding, and the later lifting of the contempt holding. *Id.*

- The first paragraph noted that Cushman "replaced" plaintiff as general counsel in "a move that c[ame] eight months after a judge found the company in

2

contempt of court for not complying with subpoenas in New York Attorney General Letitia James' Donald Trump investigation." *Id.*

- The second paragraph identified plaintiff's successor; noted that Cushman's press release announcing her appointment "made no reference to [plaintiff], who had been general counsel for nine years"; and added that "[h]is bio was removed from the company's website." *Id.*

- The third paragraph claimed that "Cushman did not respond to requests for comment, and [plaintiff] could not be located for comment." *Id.*

- The rest of the article detailed Cushman's role in the *Trump Organization* litigation; its response to the contempt holding, including a statement from a Cushman spokesman that "the firm 'disagrees with any suggestion that the firm has not exercised diligence and good faith in complying with the court's order'"; the contempt holding's eventual reversal (accompanied by a hyperlink to a more detailed article on that development); and the professional background of Cushman's new general counsel. *Id.* at 3.

Defendants contacted neither plaintiff nor Cushman before the article's publication. [1] ¶¶ 61, 62.

In August 2023, four months after the article's publication, plaintiff sent a letter to defendants demanding its retraction. *Id.* ¶ 79. Approximately two weeks later, an ALM employee emailed Cushman to say that ALM was "thinking of updating [the] story from earlier this year on [plaintiff's] departure" and asked Cushman to "address what the reasons were for [plaintiff's] departure and what effect, if any, the Trump case contempt order had on it." *Id.* ¶ 80. Cushman did not disclose the reasons for plaintiff's departure, but replied that defendants' "story, suggesting a direct link between [plaintiff's] departure and the contempt order, isn't accurate or factual." *Id.* ¶ 81.

Soon after this exchange, in September 2023, defendants revised the article. *Id.* ¶ 86. The headline now reads: "Cushman Replaces GC Who Headed Legal

3

Department During Trump Probe." *Id.* ¶ 89; [1-3] at 2. The other relevant changes are as follows:

- The subheadline now reads: "The real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. It didn't explain the departure of GC [plaintiff]." [1] ¶ 90; [1-3] at 2.

- The first paragraph now reads, in part: "The news release made no reference to [plaintiff], who had been general counsel for nine years, during which a judge found the company in contempt of court for not complying with subpoenas in New York Attorney General Letitia James' Donald Trump investigation." [1] ¶ 93; [1-3] at 2.

The article, in both forms, remains online and readily accessible to anyone who uses Google to search plaintiff's name. [1] ¶¶ 99–101. Plaintiff alleges that defendants' work was defamatory—"falsely claim[ing] that [plaintiff] was fired for his job performance … in a highly publicized New York case involving Trump"—and has prevented him from working with recruiters and securing employment. *See, e.g., id.* ¶¶ 3, 103–12.

## II.  Legal Standards

To survive a motion to dismiss, a complaint must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court presumes all well-pleaded factual allegations to be true (as it has done in detailing the relevant factual background above) and views all plausible inferences in the light most favorable to the plaintiff. *Bridges v. Blackstone, Inc.*, 66 F.4th 687, 689 (7th Cir. 2023). To understand the full context of plaintiff's claim at the motion to dismiss stage, the Court must consider the articles attached to plaintiff's complaint, [1-1] and [1-3], which are critical to his allegations. *See Burlet*

4

*v. Baldwin*, 452 F. Supp. 3d 801, 812 (N.D. Ill. 2020) (considering a radio segment central to plaintiff's defamation claim when resolving a motion to dismiss).

Here, plaintiff claims that the article, in both original and revised form, is "defamatory, and in fact, also defamatory *per se*." [1] ¶ 122. To survive defendants' motion to dismiss, plaintiff must allege that defendants (1) made a false statement about him, (2) to a third party, (3) that caused damages. *See Bd. Of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831–32 (7th Cir. 2019).

In Illinois, there are two categories of defamation: *per se* and *per quod*. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). A statement is defamatory *per quod* when extrinsic facts are required to show that it is defamatory. *Id*. In other words, in a defamation *per quod* action, a reader would need to know facts outside of an otherwise innocent article to understand the article as defamatory. *Id*.

In contrast, a statement is defamatory *per se* when it is so obviously and naturally harmful that proof of its injurious character is unnecessary. *Quilici v. Second Amend. Found.*, 769 F.2d 414, 417–18 (7th Cir. 1985). A reader would understand the defamation in an article just by reading that article. *Id*. Illinois recognizes five categories of defamation *per se,* but based on plaintiff's allegations only two are of interest here: "(1) statements that suggest that the subject can't perform his job because of lack of ability or want of integrity, and (2) statements that prejudice the subject in the pursuit of his trade or profession." *See Pippen v.*

5

*NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013) (citing *Bryson v. News Am. Publ'ns, Inc.,* 174 Ill.2d 77, 88–89 (1996)).

Also of interest is a key exception to the category of defamation *per se*: A statement that is reasonably capable of an innocent construction is not *per se* defamatory. *See Green v. Rogers*, 234 Ill. 2d 478, 500 (2009). Under this "innocent construction rule," a court must give the defendants' words their natural and obvious meaning, while considering both the substance of defendants' statements and the context in which they were made. *Id*. at 499. Headlines, for example, must be considered alongside their accompanying article, rather than in isolation. *See Huon v. Denton*, 841 F.3d 733, 739 (7th Cir. 2016). And innuendo must not be considered at all. *Glassman v. Metro. Life Ins. Co.*, 616 F. Supp. 145, 147 (N.D. Ill. 1985) ("Whether the statement complained of is susceptible of innocent construction must be resolved by the court by viewing the statement stripped of innuendo."); *Harris Tr. & Sav. Bank v. Phillips*, 154 Ill. App. 3d 574, 581 (1st Dist. 1987) ("If the actual words spoken do not by themselves denote criminal (or unethical) conduct and in common usage have a more flexible and broader meaning than ascribed by plaintiff, then, as a matter of law, the words are nonactionable as defamation *per se*."). At the same time, "when the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement." *Green*, 234 Ill. 2d at 500.

Ultimately, if the statement is capable of two reasonable constructions—one innocent and one defamatory—the innocent construction prevails. *See Muzikowski,,*

6

477 F.3d at 904. "Whether a statement is reasonably capable of an innocent construction is a question of law for the court to decide." *Republic Tobacco v. N. Atl. Trading*, 381 F.3d 717, 727 (7th Cir. 2004).

## III. Analysis

### A. Plaintiff's Claim of Defamation *Per Se*

The overall thrust of plaintiff's defamation *per se* argument is that, by implying that Cushman fired him because of the contempt proceedings in the *Trump Organization* litigation, defendants' April 2023 article told readers—and potential future employers—that plaintiff was not good at his job. *See, e.g.*, [1] ¶ 122; [23] at 4 ("The 'gist' of the April Article is that Soloway was fired from Cushman for poor job performance."). With respect to that article, plaintiff itemizes its defects as follows:

First, plaintiff objects to the article's headline, which reads "Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe," and its first paragraph, which notes that plaintiff's replacement came "eight months after a judge found the company in contempt of court." [1-1] at 2. He alleges that these statements "incorrectly connect[] [plaintiff's] retirement" to the *Trump Organization* litigation and convey that plaintiff "did something wrong" as Cushman's general counsel, thus "warrant[ing] Cushman letting him go and finding a replacement." [1] ¶¶ 38–39.

Second, plaintiff takes issue with the subheadline and second paragraph, which note that Cushman did not explain plaintiff's departure or mention plaintiff in its press release announcing the new general counsel, and that plaintiff's biography had been removed from Cushman's website.. [1-1] at 2. In plaintiff's view, these

7

statements again insinuate that he had performed poorly as Cushman's general counsel and left Cushman on bad terms. [1] ¶¶ 55–57.

Third, Cushman finds fault with the article's third paragraph, which reports that Cushman did not respond to a request for comment and that plaintiff could not be reached for comment. [1-1] at 2; [1] ¶¶ 61-62. According to plaintiff, both assertions are untrue. [1] ¶¶ 61-62.

One obstacle to plaintiff's piecemeal attack on the April 2023 article—i.e., his isolation of particular words, phrases, and sentences—is the Court's obligation, when applying the innocent construction rule, to asks how a "reasonable reader" might understand the article *as a whole. See Bryson*, 174 Ill. 2d at 102; *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 570 (2003) ("Not only is the headline to be considered with the body of the article as a single entity, but the import of the entire article must be considered in reaching a determination of reasonable innocent construction.") (cleaned up). Could a reasonable reader understand the article to imply that plaintiff was fired because of his poor performance in the *Trump Organization* litigation? Possibly. But a reasonable reader also could understand the article more literally: that plaintiff left Cushman eight months after the contempt holding in the *Trump Organization* litigation, that the contempt holding was lifted before plaintiff's departure, and that plaintiff's exit was neither mentioned in Cushman's press release nor did his biography remain on Cushman's website. *See* [1-1] at 2-3.

8

To underscore the reasonableness of this latter construction, the Court responds more precisely to plaintiff's reading of defendants' words.

### *The Headline's Use of "In the Wake Of" and "Rebuke"*

Plaintiff takes great issue with the headline's use of the phrase "in the wake of." [1] ¶¶ 4, 38–39, 89; [23] at 3. According to plaintiff, the phrase can be read only to mean "because of" and, as a result, the headline can only be understood as stating that plaintiff left Cushman "because of" his performance with respect to the *Trump Organization* litigation.

Read as a whole, however, the April 2023 article contextualizes plaintiff's exit from Cushman within the firm's latest legal and personnel developments. It accurately describes plaintiff's professional background, Cushman's relationship with the Trump Organization, the events that led to the contempt holding, the overturning of the contempt holding,[1] plaintiff's exit from Cushman eight months later, his nonappearance in Cushman's press release and on Cushman's website, and the professional background of Cushman's new general counsel. *See generally* [1-1]. In fact, plaintiff is only mentioned in the first three paragraphs of the 13-paragraph article. *Id.* Even if a reader were to understand the headline to imply that plaintiff

---

[1] Plaintiff alleges that the article "omits key context: Cushman's contempt order in the Trump-related case was revoked in August 2022." [23] at 6; *accord* [1] ¶¶ 31, 96. This is incorrect. The article makes clear in its "What You Need To Know" section that "another judge later gave the firm more time." [1-1] at 2. Later in the article, defendants explain that "another judge later granted time extensions that allowed the company to avoid the fines." *Id.* at 2-3. The April 2023 article also provided a hyperlink to an earlier article that explains the lifting of the contempt order in greater detail. *Id.; see also* Cailley LaPara, *Cushman & Wakefield squirms out of Trump sanctions*, THE REAL DEAL (July 13, 2022), https://therealdeal.com/new-york/2022/07/13/cushman-wakefield-squirms-out-of-trump-sanctions.

RSA 010

was fired because of the contempt holding, that misconception would be cured once the reader read the actual article and learned that Cushman publicly defended the manner in which its attorneys responded to the subpoenas in the *Trump Organization* litigation; the initial contempt holding was later set aside by another court; and after it was set aside, plaintiff departed Cushman for unannounced reasons. [1-1] at 2-3.

Moreover, even if the "in the wake of" language were to be understood in isolation as plaintiff urges—say, in a tweet or Google search—it would still be susceptible to the innocent construction rule. [1] ¶ 86; [23] at 6. The Court may refer to dictionary definitions to analyze the meaning of a purportedly defamatory word. *See Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 137 (1st Dist. 2007) (definitions are not dispositive, but they are persuasive). Under the innocent construction rule, a word or phrase that has multiple reasonable meanings—some defamatory, some innocent—is not defamatory *per se*. *See id.* (where a word has multiple defamatory and innocent meanings, it is "not necessarily" defamatory, and the innocent construction rules applies). As defendants point out, "in the wake of" is an idiom with two meanings: "after" or "after and … because of." [16] at 10.[2] It would be reasonable therefore to understand "in the wake of" simply to mean "after." And it

---

[2] *See In the Wake of*, Cambridge Univ. Dictionary, www.dictionary.cambridge.org/us/dictionary/english/in-the-wake-of; *accord In the Wake of,* Dictionary.com, www.dictionary.com/browse/in--the--wake--of (defined as "[i]n the aftermath of, as a consequence of," or "[f]ollowing directly on").

RSA 011

is true, and therefore not defamatory, that plaintiff departed Cushman after the contempt holding. [1-1] at 2.

Indeed, plaintiff seems to agree that this nondefamatory reading is also "plausible," but argues that "[i]t is far *more* plausible to read a defamatory meaning into the headline … than to read a non-defamatory, innocent construction." [23] at 7 (emphasis added). But when two constructions are plausible, as plaintiff seems to concede here, then the innocent one prevails. *See Harte v. Chicago Council of L.*, 220 Ill. App. 3d 255, 262 (1st Dist. 1991) ("[T]he innocent construction rule does not allow for the balancing of reasonable constructions.").

Plaintiff separately takes issue with the headline's use of "rebuke." [1] ¶ 4; [23] at 6. Plaintiff assumes without explanation that "rebuke" can only refer to the since-lifted contempt holding. *Id.* But the definition of "rebuke" extends far beyond contempt orders, and includes, for example, "sharp, stern disapproval; reproof; reprimand."[3] Recall from the April 2023 article that in the *Trump Organization* litigation, the court reprimanded Cushman for "cho[osing] to treat the looming deadlines cavalierly." [1-1] at 3. A reasonable reader could understand "rebuke" to refer to that expression of disapproval, rather than the contempt holding.

So, even if the headline were understood in isolation, it would still be nondefamatory under the innocent construction rule.

---

[3] *See Rebuke*, Dictionary.com, https://www.dictionary.com/browse/rebuke.

11

### *The Third Paragraph's "No Comment" and "Unavailable for Comment" Language*

Plaintiff takes issue with the article's third paragraph, which states that Cushman did not respond to request for comment and that plaintiff could not be located for comment. [1-1] at 2. Plaintiff alleges that defendants never attempted to reach either Cushman or him for comment. [1] ¶¶ 61-62. But to state a claim for defamation, a plaintiff must allege that "the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that [the] publication caused damages." *Bd. of Forensic Document Examiners, Inc.*, 922 F.3d at 831 (quoting *Green*, 234 Ill. 2d at 491). Keeping those elements in mind, these statements cannot be defamatory of plaintiff for three reasons.

First, Soloway is the only plaintiff in this case. To bring a defamation claim, plaintiff must allege that defendants "made a false statement about [*him*]." *Id.* (emphasis added). A statement made about a third party—here, Cushman—cannot defame plaintiff. Second, plaintiff alleges that defendants never attempted to locate him for comment. [1] ¶ 62. Yet he does not explain how a statement that concerns *defendants'* unsuccessful attempts to locate him is "about the plaintiff." *Id.* If anything, the sentence reflects poorly on defendants' investigative abilities. Finally, because he cannot establish the defamatory nature of the third paragraph, by extension, he does not sufficiently allege how it "caused damages." *Bd. of Forensic Document Examiners, Inc.*, 922 F.3d at 831.

RSA 013

\* \* \*

Returning to the big picture: The Court's reading of the April 2023 article—that plaintiff simply left Cushman eight months after the contempt holding in the *Trump Organization* litigation; that the contempt holding was lifted before plaintiff's departure; and that plaintiff was neither mentioned in Cushman's press release nor did his biography remain on Cushman's website—is one that is "natural," "obvious," and devoid of "innuendo." *See Bryson*, 174 Ill. 2d at 94. It is therefore not defamatory *per se*.

By comparison, plaintiff's interpretation requires a reader to make several linguistic and logical leaps: that "replaced" really meant "removed"; that "in the wake of" really meant "because of"; that "rebuke" really meant "contempt holding"; that because plaintiff's departure was not explained in Cushman's news release and his biography was unavailable on Cushman's website, he must have left on bad terms; that because he left on bad terms, he must have been fired; that because the article discussed the contempt holding, the contempt holding must have instigated his firing; and that because he was fired, he must have performed poorly in his job. [1] ¶ 44; [23] at 3-4. None of these implications are spelled out in the article and instead require plaintiff's extensive annotations to follow.

At bottom, defendant engages in a type of exegesis precluded under the innocent construction rule. *See Harris Tr. & Sav. Bank*, 154 Ill. App. 3d at 580 ("Harris' apparent need to alter, supplement and interpret the alleged statement of Phillips is conclusive evidence that Phillips' actual words were not, standing by

themselves, defamatory per se."); *Levinson v. Time, Inc.*, 89 Ill. App. 3d 338, 342 (1st Dist. 1980) ("Although plaintiff contends reports of his 'uncooperative' behavior suggest immoral motives or actions, no such exegesis is possible since the statements must be read 'stripped of innuendo.'"). Plaintiff's additions to, and contortions of, the article's words to support his defamatory interpretation thus provides strong evidence that the April 2023 article is not defamatory *per se*.

### *The September 2023 Version*

Plaintiff's claim fares no better when the Court turns its attention to the September 2023 iteration of the original article. Plaintiff argues that defendants' later updates to the original article only amplified its defamatory nature. [1] ¶ 87. He contends that the new headline—"Cushman Replaces GC Who Headed Legal Department During Trump Probe"—"still suggests that [plaintiff] was replaced *due to* a 'Trump Probe.'" *Id.* ¶ 89 (emphasis added). But, again, the innocent construction rule allows for a reasonable, non-defamatory reading of this headline: that Cushman replaced plaintiff, who happened to have been the firm's general counsel during the *Trump Organization* litigation.

Plaintiff's remaining contentions as to the September article mirror his contentions as to the April article and likewise falter under the innocent construction rule. [1] ¶¶ 90-97.

14

## B. Defamation *Per Quod*

Despite not mentioning defamation *per quod* in his complaint,[4] plaintiff alters course in his response and argues that he "adequately" pled both defamation *per se* and *per quod*. [23] at 8. The two forms of defamation have different pleading requirements. To assert a claim of defamation *per quod*, a plaintiff must allege (1) extrinsic facts to establish that the statement is defamatory, and (2) special damages, with specificity. *See Pippen*, 734 F.3d at 613–14; *Fedders Corp. v. Elite Classics*, 279 F. Supp. 2d 965, 969 (N.D. Ill. 2003). Plaintiff's complaint does neither.

### *Extrinsic Facts*

To allege defamation *per quod*, a plaintiff must allege that the defamatory meaning can *only* be established by referencing extrinsic facts. *Dornhecker v. Ameritech Corp.*, 99 F. Supp. 2d 918, 933 (N.D. Ill. 2000). This is quite opposite of defamation *per se*, where defamation is obvious on the face of the statement. *See Quilici*, 769 F.2d at 414. As an example of defamation *per quod* provided by one Illinois court (in 1902): an otherwise innocent report of a mother's delivery of twins became defamatory *per quod* where the mother showed, as an extrinsic fact, that some readers knew she had been married for only one month. *See Bryson*, 174 Ill. 2d at 87 (citing *Morrison v. Ritchie & Co.*, 39 Scottish L. R. 432 (1902)). And if an article did not mention a plaintiff's name, but the plaintiff showed through extrinsic

---

[4] In response to defendants' motion to dismiss, plaintiff claims he adequately raised defamation *per quod* when he stated that "[t]he Articles were defamatory, and in fact, also defamatory *per se*." [23] at 8 (citing [1] ¶ 122). He does not explain how this phrasing was intended to apprise defendants of a defamation *per quod* allegation. *See* [16] at 10 n.6 ("[T]he Complaint does not plead or even mention defamation *per quod*."). In any event, even if plaintiff had mentioned defamation *per quod*, he still failed to properly allege it.

15

evidence that readers understood the article to refer to him, that article, too, would be defamatory *per quod. See Barry Harlem Corp. v. Kraff*, 273 Ill. App. 3d 388, 390 (1st Dist. 1995). In other words, in a defamation *per quod* action, extrinsic facts turn an otherwise innocuous statement defamatory.

Here, plaintiff does not plead such extrinsic facts. [23] at 13-14. Indeed, he cannot plead such facts because he takes pains in his complaint to allege that a reader need only look to the article's headline, or its paragraphs in isolation, to understand its defamatory meaning.[5] Because "*[p]er quod* statements are not defamatory on their face and require extrinsic facts or innuendo to explain their defamatory meaning," plaintiff's claim—by its very nature—is one of defamation *per se*, rather than defamation *per quod. See Barry Harlem Corp.*, 273 Ill. App. 3d at 394.

In response, plaintiff list facts taken from his complaint that he tries to cast as extrinsic. [23] at 8-9. These facts include that his resignation from Cushman was unrelated to the *Trump Organization* litigation; that information concerning the lifting of the contempt holding was available publicly; that Cushman was represented by two firms during the *Trump Organization* litigation rather than by plaintiff directly; that Cushman was not a party to the *Trump Organization* litigation; that Cushman was not legally required to announce plaintiff's departure; and that

---

[5] *See* [1] ¶¶ 38 ("The headline of the Article alone, in addition to the Article as a whole, are false and defamatory."); 49 (the tweet with the article's headline is defamatory); 50 (the headline is defamatory); 51 (the first paragraph is defamatory); 54 (the second paragraph is defamatory); 56 (defamation is "implicit" to the article); 60 (the third paragraph is defamatory); 63 (the fourth paragraph is defamatory); 99 (defamatory headlines are apparent to anyone who searches plaintiff's name on Google); 111 ("The moment that executive recruiters and companies Google 'Brett Soloway,' they see the defamatory Articles and decide that anyone connected to a 'Trump Probe' is not employable.").

defendants did not reach out to plaintiff for comment before publishing their article. *Id.*

Some of these facts are reflected in the article itself. Others are undercut by plaintiff's own allegations. *See, e.g.*, [1] ¶ 15 (alleging that plaintiff "oversaw … all of Cushman's legal efforts," including litigation, and "oversaw outside counsel that Cushman hired for litigation matters"). All of them establish that plaintiff understands defendants' article to be false. But none of these facts "establish[] that [defendants' article] was interpreted as being defamatory" by its readers. *See Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416 (1996). For this reason alone, plaintiff has failed to allege defamation *per quod*.

### *Special Damages*

Even if plaintiff could point to extrinsic facts, he still fails to plead defamation *per quod* because he did not specifically state special damages. *See* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.").

Plaintiff claims that his damages are his failure to obtain interviews or maintain a relationship with a recruiter, [1] ¶¶ 105-08, 110, which resulted in a loss of $2 million a year from failed job opportunities, *id.* ¶ 115. But there are two problems with this allegation.

First, "the failure to obtain an interview or further inquiries from a recruiter would not sufficiently establish defamation *per quod*." *Kapotas v. Better Gov't Ass'n*, 2015 IL App (1st) 140534, ¶ 73 (1st Dist. 2015). Second, though plaintiff claims $2 million yearly in damages, this figure is simply his salary before he left Cushman. [1]

17

¶ 114. He does not allege that plaintiff's article caused him to be denied any one specific job that would have earned $2 million annually. *See Pippen*, 734 F.3d at 614 (plaintiff's allegations of special damages were sufficient because he "itemized losses … he identified specific business opportunities that had been available to him earlier but that, following the defendants' statements, were available no more").

## IV.  Conclusion

Plaintiff has failed to allege that defendants' original article, and its later iteration, defamed him *per se*. Moreover, by stressing that a reader need only look to the article to understand its defamatory meaning, plaintiff has failed to establish defamation *per quod*. Plaintiff's complaint [1] is dismissed without prejudice.[6]

If plaintiff elects to file an amended complaint, he must do so on or before November 7, 2024. In an amended complaint, plaintiff may advance a theory of defamation *per quod*, but in light of the Court's analysis of defendants' words above,

---

[6] Defendants propose three alternative grounds on which to dismiss plaintiff's complaint outright: that the article is protected under Illinois' fair report privilege, [16] at 11; that any implication that plaintiff's departure from Cushman was connected to the *Trump Organization* litigation is protected as an opinion, *id.* at 14; and that the article is substantially true, *id.* at 13. These defenses are not at this time persuasive to the Court. First, the fair report privilege requires that the article be a "report of an official proceeding." *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1104 (N.D. Ill. 2016). Defendants' article was not limited to reporting an "official proceeding": It also discussed plaintiff's departure from Cushman and Cushman's incoming general counsel. [1-1] at 2-3. Second, opinions are only protected when they "cannot reasonably be interpreted as stating actual facts about the plaintiff, when viewed from the perspective of an ordinary reader." *Doctor's Data Inc.*, 170 F. Supp. 3d at 1113 (cleaned up). Nowhere in the article do defendants clearly express a subjective view or interpretation. *Id.* Therefore, an ordinary reader could reasonably interpret the article as stating actual facts about the plaintiff. Finally, the question of substantial truth is typically reserved for the jury. *Ludlow v. Northwestern Univ.*, 79 F. Supp. 3d 824, 837 (N.D. Ill. 2015). In any event, defendants make clear that their substantial truth defense "goes hand-in-hand with their opinion argument," [26] at 9, so the Court declines to address it at this time. Defendants are free to raise these defenses in future motions.

RSA 019

plaintiff may not advance a claim based on defamation *per se*. Defendants' motion to stay discovery [17] is denied as moot.

_____
Georgia N. Alexakis
United States District Judge

Date: <u>October 18, 2024</u>

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.1)
### Eastern Division

Brett Soloway

                        Plaintiff,

v.                                   Case No.: 1:24−cv−02925
                                   Honorable Georgia N Alexakis

ALM Global, LLC, et al.

                        Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, November 8, 2024:

      MINUTE entry before the Honorable Georgia N Alexakis: Plaintiff's complaint [1] was dismissed without prejudice for failing to state a claim upon which relief can be granted. [39]. Plaintiff was informed that he had until 11/7/2024 to amend his complaint, or else that dismissal would be converted to one with prejudice and his case would be closed. That deadline has passed. Plaintiff's complaint is now dismissed with prejudice. Civil case terminated.(ca, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

Brett Soloway,

Plaintiff(s),

v.

ALM Global, LLC, Hugo Guzman,

Defendant(s).

Case No. 24-cv-2925
Judge Georgia N. Alexakis

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $        ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.
Plaintiff(s) shall recover costs from defendant(s).

☐ in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

☒ other: Plaintiff's complaint is dismissed with prejudice for failure to file an amended complaint by the deadline.

This action was *(check one)*:

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge        without a jury and the above decision was reached.
☒ decided by Judge Georgia N. Alexakis on a motion/order dated 11/8/24.

Date: 11/8/2024                    Thomas G. Bruton, Clerk of Court

                                   Carmen Acevedo , Deputy Clerk